## HOUCHINS, SHERIFF OF THE COUNTY OF ALA-MEDA, CALIFORNIA *v.* KQED, INC., ET AL.

No. 76–1310.   Argued November 29, 1977—Decided June 26, 1978

Burger, C. J., announced the Court's judgment and delivered an opinion, in which White and Rehnquist, JJ., joined. Stewart, J., filed an opinion concurring in the judgment, *post*, p. 16. Stevens, J., filed a dissenting opinion, in which Brennan and Powell, JJ., joined, *post*, p. 19. Marshall and Blackmun, JJ., took no part in the consideration or decision of the case.

*Kelvin H. Booty, Jr.,* argued the cause for petitioner. With him on the briefs was *Richard J. Moore.*

*William Bennett Turner* argued the cause for respondents. With him on the brief were *Jack Greenberg, James M. Nabrit III,* and *Stanley A. Bass.*\*

MR. CHIEF JUSTICE BURGER announced the judgment of the Court and delivered an opinion, in which MR. JUSTICE WHITE and MR. JUSTICE REHNQUIST joined.

The question presented is whether the news media have a constitutional right of access to a county jail, over and above that of other persons, to interview inmates and make sound recordings, films, and photographs for publication and broadcasting by newspapers, radio, and television.

## I

Petitioner Houchins, as Sheriff of Alameda County, Cal., controls all access to the Alameda County Jail at Santa Rita. Respondent KQED operates licensed television and radio broadcasting stations which have frequently reported newsworthy events relating to penal institutions in the San Francisco Bay Area. On March 31, 1975, KQED reported the suicide of a prisoner in the Greystone portion of the Santa Rita jail. The report included a statement by a psychiatrist that the conditions at the Greystone facility were responsible for the illnesses of his patient-prisoners there, and a statement from petitioner denying that prison conditions were responsible for the prisoners' illnesses.

KQED requested permission to inspect and take pictures within the Greystone facility. After permission was refused, KQED and the Alameda and Oakland branches of the National Association for the Advancement of Colored People

---

\*Briefs of *amici curiae* urging affirmance were filed by *Christopher B. Fager, William G. Mullen,* and *James R. Cregan* for the National Newspaper Assn. et al.; and by *I. Daniel Stewart, Jr.,* for Kearns-Tribune Corp.

(NAACP) filed suit under 42 U. S. C. § 1983. They alleged that petitioner had violated the First Amendment by refusing to permit media access and failing to provide any effective means by which the public could be informed of conditions prevailing in the Greystone facility or learn of the prisoners' grievances. Public access to such information was essential, they asserted, in order for NAACP members to participate in the public debate on jail conditions in Alameda County. They further asserted that television coverage of the conditions in the cells and facilities was the most effective way of informing the public of prison conditions.

.The complaint requested a preliminary and permanent injunction to prevent petitioner from "excluding KQED news personnel from the Greystone cells and Santa Rita facilities and generally preventing full and accurate news coverage of the conditions prevailing therein." On June 17, 1975, when the complaint was filed, there appears to have been no formal policy regarding public access to the Santa Rita jail. However, according to petitioner, he had been in the process of planning a program of regular monthly tours since he took office six months earlier. On July 8, 1975, he announced the program and invited all interested persons to make arrangements for the regular public tours. News media were given notice in advance of the public and presumably could have made early reservations.

Six monthly tours were planned and funded by the county at an estimated cost of $1,800. The first six scheduled tours were filled within a week after the July 8 announcement.[1] A KQED reporter and several other reporters were on the first tour on July 14, 1975.

Each tour was limited to 25 persons and permitted only limited access to the jail. The tours did not include the disciplinary cells or the portions of the jail known as "Little

---

[1] According to petitioner, the initial public interest in the tours has now subsided and there is no longer a waiting list.

Greystone," the scene of alleged rapes, beatings, and adverse physical conditions. Photographs of some parts of the jail were made available, but no cameras or tape recorders were allowed on the tours. Those on the tours were not permitted to interview inmates, and inmates were generally removed from view.

In support of the request for a preliminary injunction, respondents presented testimony and affidavits stating that other penal complexes had permitted media interviews of inmates and substantial media access without experiencing significant security or administrative problems. They contended that the monthly public tours at Santa Rita failed to provide adequate access to the jail for two reasons: (a) once the scheduled tours had been filled, media representatives who had not signed up for them had no access and were unable to cover newsworthy events at the jail; (b) the prohibition on photography and tape recordings, the exclusion of portions of the jail from the tours, and the practice of keeping inmates generally removed from view substantially reduced the usefulness of the tours to the media.

In response, petitioner admitted that Santa Rita had never experimented with permitting media access beyond that already allowed; he did not claim that disruption had been caused by media access to other institutions. He asserted, however, that unregulated access by the media would infringe inmate privacy,[2] and tend to create "jail celebrities," who in turn tend to generate internal problems and undermine jail security. He also contended that unscheduled media tours would disrupt jail operations.

---

[2] It is true that inmates lose many rights when they are lawfully confined, but they do not lose all civil rights. See, e. g., Wolff v. McDonnell, 418 U. S. 539, 555–556 (1974), and cases cited therein. Inmates in jails, prisons, or mental institutions retain certain fundamental rights of privacy; they are not like animals in a zoo to be filmed and photographed at will by the public or by media reporters, however "educational" the process may be for others.

Petitioner filed an affidavit noting the various means by which information concerning the jail could reach the public. Attached to the affidavit were the current prison mail, visitation, and phone call regulations. The regulations allowed inmates to send an unlimited number of letters to judges, attorneys, elected officials, the Attorney General, petitioner, jail officials, or probation officers, all of which could be sealed prior to mailing. Other letters were subject to inspection for contraband but the regulations provided that no inmate mail would be read.

With few exceptions,[3] all persons, including representatives of the media, who knew a prisoner could visit him. Media reporters could interview inmates awaiting trial with the consent of the inmate, his attorney, the district attorney, and the court. Social services officers were permitted to contact "relatives, community agencies, employers, etc.," by phone to assist in counseling inmates with vocational, educational, or personal problems. Maximum-security inmates were free to make unmonitored collect telephone calls from designated areas of the jail without limit.

After considering the testimony, affidavits, and documentary evidence presented by the parties, the District Court preliminarily enjoined petitioner from denying KQED news personnel and "responsible representatives" of the news media access to the Santa Rita facilities, including Greystone, "at reasonable times and hours" and "from preventing KQED news personnel and responsible representatives of the news media from utilizing photographic and sound equipment or from utilizing inmate interviews in providing full and accurate coverage of the Santa Rita facilities."

---

[3] Persons who were on parole or had been released from a state prison could not visit without the approval of the commanding officer. Persons released from the Santa Rita or the courthouse jail within a certain period of time were also required to obtain approval to visit from the commanding officer.

The District Court rejected petitioner's contention that the media policy then in effect was necessary to protect inmate privacy or minimize security and administrative problems. It found that the testimony of officials involved with other jails indicated that a "more flexible press policy at Santa Rita [was] both desirable and attainable." The District Court concluded that the respondents had "demonstrated irreparable injury, absence of an adequate remedy at law, probability of success on the merits, a favorable public interest, and a balance of hardships" in their favor.

On interlocutory appeal from the District Court's order, petitioner invoked *Pell* v. *Procunier*, 417 U. S. 817, 834 (1974), where this Court held that "newsmen have no constitutional right of access to prisons or their inmates beyond that afforded to the general public." He contended that the District Court had departed from *Pell* and abused its discretion because it had ordered that he give the media greater access to the jail than he gave to the general public. The Court of Appeals rejected petitioner's argument that *Pell* and *Saxbe* v. *Washington Post Co.*, 417 U. S. 843 (1974), were controlling. It concluded, albeit in three separate opinions,[4] that the public and the media had a First and Fourteenth Amendment right of access to prisons and jails, and sustained the District Court's order.

## II

Notwithstanding our holding in *Pell* v. *Procunier, supra,* respondents assert that the right recognized by the Court of Appeals flows logically from our decisions construing the First Amendment. They argue that there is a constitutionally guaranteed right to gather news under *Pell* v. *Procunier, supra,* at 835, and *Branzburg* v. *Hayes,* 408 U. S. 665, 681, 707 (1972). From the right to gather news and the right to receive information, they argue for an implied special right of access to

---

[4] See 546 F. 2d 284 (CA9 1976).

government-controlled sources of information. This right, they contend, compels access as a *constitutional* matter. Respondents suggest further support for this implicit First Amendment right in the language of *Grosjean* v. *American Press Co.*, 297 U. S. 233, 250 (1936), and *Mills* v. *Alabama*, 384 U. S. 214, 219 (1966), which notes the importance of an informed public as a safeguard against "misgovernment" and the crucial role of the media in providing information. Respondents contend that public access to penal institutions is necessary to prevent officials from concealing prison conditions from the voters and impairing the public's right to discuss and criticize the prison system and its administration.

## III

We can agree with many of the respondents' generalized assertions; conditions in jails and prisons are clearly matters "of great public importance." *Pell* v. *Procunier, supra,* at 830 n. 7. Penal facilities are public institutions which require large amounts of public funds, and their mission is crucial in our criminal justice system. Each person placed in prison becomes, in effect, a ward of the state for whom society assumes broad responsibility. It is equally true that with greater information, the public can more intelligently form opinions about prison conditions. Beyond question, the role of the media is important; acting as the "eyes and ears" of the public, they can be a powerful and constructive force, contributing to remedial action in the conduct of public business. They have served that function since the beginning of the Republic, but like all other components of our society media representatives are subject to limits.

The media are not a substitute for or an adjunct of government and, like the courts, they are "ill equipped" to deal with problems of prison administration. Cf. *Procunier* v. *Martinez,* 416 U. S. 396, 405 (1974). We must not confuse the role of the media with that of government; each has special, crucial

functions, each complementing—and sometimes conflicting with—the other.

The public importance of conditions in penal facilities and the media's role of providing information afford no basis for reading into the Constitution a right of the public or the media to enter these institutions, with camera equipment, and take moving and still pictures of inmates for broadcast purposes. This Court has never intimated a First Amendment guarantee of a right of access to all sources of information within government control. Nor does the rationale of the decisions upon which respondents rely lead to the implication of such a right.

*Grosjean* v. *American Press Co., supra,* and *Mills* v. *Alabama, supra,* emphasized the importance of informed public opinion and the traditional role of a free press as a source of public information. But an analysis of those cases reveals that the Court was concerned with the freedom of the media to *communicate* information once it is obtained; neither case intimated that the Constitution *compels* the government to provide the media with information or access to it on demand. *Grosjean* involved a challenge to a state tax on advertising revenues of newspapers, the "plain purpose" of which was to penalize the publishers and curtail the publication of a selected group of newspapers. 297 U. S., at 251. The Court summarized the familiar but important history of the attempts to prevent criticism of the Crown in England by the infamous licensing requirements and special taxes on the press, *id.,* at 245–247, and concluded that the First Amendment had been designed to prevent similar restrictions or any other "form of previous restraint upon printed publications, or their circulation." *Id.,* at 249.[5]

---

[5] The Court relied upon *Near* v. *Minnesota ex rel. Olson,* 283 U. S. 697, 713–716 (1931). More recently in *Organization for a Better Austin* v. *Keefe,* 402 U. S. 415 (1971), these concepts were reaffirmed. See also *Nebraska Press Assn.* v. *Stuart,* 427 U. S. 539 (1976); *Miami Herald Publishing Co.* v. *Tornillo,* 418 U. S. 241 (1974).

In discussing the importance of an "untrammeled press," the Court in *Grosjean* readily acknowledged the need for "informed public opinion" as a restraint upon misgovernment. 297 U. S., at 250. It also criticized the tax at issue because it limited "the circulation of information to which the public [was] entitled." *Ibid.* But nothing in the Court's holding implied a special privilege of *access* to information as distinguished from a right to publish information which has been obtained; *Grosjean* dealt only with government attempts to burden and restrain a newspaper's communication with the public. The reference to a public entitlement to information meant no more than that the government cannot restrain communication of whatever information the media acquire—and which they elect to reveal. Cf. *Landmark Communications, Inc.* v. *Virginia,* 435 U. S. 829, 838 (1978).

*Mills* involved a statute making it a crime to publish an editorial about election issues on election day. In striking down the statute, the Court noted that "a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs," 384 U. S., at 218. The Court also discussed the role of the media "as a powerful antidote to any abuses of power by governmental officials and as a constitutionally chosen means for keeping officials elected by the people responsible to all the people whom they were selected to serve." *Id.,* at 219. As in *Grosjean,* however, the Court did not remotely imply a constitutional right guaranteeing anyone access to government information beyond that open to the public generally.

*Branzburg* v. *Hayes, supra,* offers even less support for the respondents' position. Its observation, in dictum, that "news gathering is not without its First Amendment protections," 408 U. S., at 707, in no sense implied a constitutional right of access to news sources. That observation must be read in context; it was in response to the contention that forcing a reporter to disclose to a grand jury information received in

confidence would violate the First Amendment by deterring news sources from communicating information. *Id.*, at 680. There is an undoubted right to gather news "from any source by means within the law," *id.*, at 681–682, but that affords no basis for the claim that the First Amendment compels others—private persons or governments—to supply information.

That the Court assumed in *Branzburg* that there is no First Amendment right of access to information is manifest from its statements that

> "the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally," *id.*, at 684,

and that

> "[n]ewsmen have no constitutional right of access to the scenes of crime or disaster when the general public is excluded," *id.*, at 684–685.

*Pell* v. *Procunier* and *Saxbe* v. *Washington Post Co.* also assumed that there is no constitutional right of access such as the Court of Appeals conceived. In those cases the Court declared, explicitly and without reservation, that the media have "no constitutional right of access to prisons or their inmates beyond that afforded the general public," *Pell*, 417 U. S., at 834; *Saxbe*, 417 U. S., at 850, and on that premise the Court sustained prison regulations that prevented media interviews with inmates.

The fact that the Court relied upon *Zemel* v. *Rusk*, 381 U. S. 1 (1965), in both *Branzburg*, 408 U. S., at 684 n. 22, and *Pell, supra*, at 834 n. 9, further negates any notion that the First Amendment confers a right of access to news sources. The appellant in *Zemel* made essentially the same argument that respondents advance here. He contended that the ban on travel to Cuba, then in effect, interfered with his First Amendment right to acquaint himself with the effects of our

Government's foreign and domestic policies and the conditions in Cuba that might affect those policies. Mr. Chief Justice Warren, writing for the Court, flatly rejected the contention that there was a First Amendment right at stake, stating:

"[T]here are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow. For example, the prohibition of unauthorized entry into the White House diminishes the citizen's opportunities to gather information he might find relevant to his opinion of the way the country is being run, but that does not make entry into the White House a First Amendment right. *The right to speak and publish does not carry with it the unrestrained right to gather information.*" 381 U. S., at 16–17. (Emphasis added.)

The right to *receive* ideas and information is not the issue in this case. See, *e. g., Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council,* 425 U. S. 748 (1976); *Procunier* v. *Martinez,* 416 U. S., at 408–409; *Kleindienst* v. *Mandel,* 408 U. S. 753, 762–763 (1972). The issue is a claimed special privilege of access which the Court rejected in *Pell* and *Saxbe,* a right which is not essential to guarantee the freedom to communicate or publish.

## IV

The respondents' argument is flawed, not only because it lacks precedential support and is contrary to statements in this Court's opinions, but also because it invites the Court to involve itself in what is clearly a legislative task which the Constitution has left to the political processes. Whether the government should open penal institutions in the manner sought by respondents is a question of policy which a legislative body might appropriately resolve one way or the other.

A number of alternatives are available to prevent problems in penal facilities from escaping public attention. The early penal reform movements in this country and England gained impetus as a result of reports from citizens and visiting com-

mittees who volunteered or received commissions to visit penal institutions and make reports. See T. Eriksson, The Reformers 32–42, 69 (Djurklou translation 1976); W. Crawford, Report on the Penitentiaries of the United States vii–viii, xiii–xv, 10–11, App. 9 (1969 ed.); B. McKelvey, American Prisons 52–56, 193 (1936). Citizen task forces and prison visitation committees continue to play an important role in keeping the public informed on deficiencies of prison systems and need for reforms.[6] Grand juries, with the potent subpoena power—not available to the media—traditionally concern themselves with conditions in public institutions; a prosecutor or judge may initiate similar inquiries, and the legislative power embraces an arsenal of weapons for inquiry relating to tax-supported institutions. In each case, these public bodies are generally compelled to publish their findings and, if they default, the power of the media is always available to generate public pressure for disclosure. But the choice as to the most effective and appropriate method is a policy decision to be resolved by legislative decision.[7] We must not confuse what is "good," "desirable," or "expedient" with what is constitutionally commanded by the First Amendment. To do so is to trivialize constitutional adjudication.

Unarticulated but implicit in the assertion that media access to the jail is essential for informed public debate on jail conditions is the assumption that media personnel are the

---

[6] See, e. g., Behind the Bars, ABA Report of Young Lawyers Section on Prison Visitation Program 1970–1975; Case, Citizen Participation: An Experiment in Prison-Community Relations, 30 Federal Probation 18, 19–21 (Dec. 1966); Final Report of the Ohio Citizens' Task Force on Corrections A28 (1971); Report of the Illinois Subcommittee on Penal Institutions of the Legislative Comm'n To Visit and Examine State Institutions (1969); Massachusetts, Governor's Task Force on Correctional Industries, Final Report (Sept. 1970); California Correctional System Study, Final Report, California Board of Corrections (July 1971).

[7] The Freedom of Information Act, 5 U. S. C. § 552 (1976 ed.), for example, is the result of legislative decisions.

best qualified persons for the task of discovering malfeasance in public institutions. But that assumption finds no support in the decisions of this Court or the First Amendment. Editors and newsmen who inspect a jail may decide to publish or not to publish what information they acquire. Cf. *Columbia Broadcasting System, Inc.* v. *Democratic National Committee,* 412 U. S. 94, 124 (1973); *Miami Herald Publishing Co.* v. *Tornillo,* 418 U. S. 241 (1974); Note, The Rights of the Public and the Press To Gather Information, 87 Harv. L. Rev. 1505, 1508, 1513 (1974). Public bodies and public officers, on the other hand, may be coerced by public opinion to disclose what they might prefer to conceal. No comparable pressures are available to anyone to compel publication by the media of what they might prefer not to make known.

There is no discernible basis for a constitutional duty to disclose, or for standards governing disclosure of or access to information. Because the Constitution affords no guidelines, absent statutory standards, hundreds of judges would, under the Court of Appeals' approach, be at large to fashion ad hoc standards, in individual cases, according to their own ideas of what seems "desirable" or "expedient." We, therefore, reject the Court of Appeals' conclusory assertion that the public and the media have a First Amendment right to government information regarding the conditions of jails and their inmates and presumably all other public facilities such as hospitals and mental institutions.

> "There is no constitutional right to have access to particular government information, or to require openness from the bureaucracy. [Citing *Pell* v. *Procunier, supra.*] The public's interest in knowing about its government is protected by the guarantee of a Free Press, but the protection is indirect. The Constitution itself is neither a Freedom of Information Act nor an Official Secrets Act.
>
> "The Constitution, in other words, establishes the contest, not its resolution. Congress may provide a resolu-

tion, at least in some instances, through carefully drawn legislation. For the rest, we must rely, as so often in our system we must, on the tug and pull of the political forces in American society." Stewart, "Or of the Press," 26 Hastings L. J. 631, 636 (1975).

Petitioner cannot prevent respondents from learning about jail conditions in a variety of ways, albeit not as conveniently as they might prefer. Respondents have a First Amendment right to receive letters from inmates criticizing jail officials and reporting on conditions. See *Procunier* v. *Martinez,* 416 U. S., at 413–418. Respondents are free to interview those who render the legal assistance to which inmates are entitled. See *id.,* at 419. They are also free to seek out former inmates, visitors to the prison, public officials, and institutional personnel, as they sought out the complaining psychiatrist here.

Moreover, California statutes currently provide for a prison Board of Corrections that has the authority to inspect jails and prisons and *must* provide a public report at regular intervals. Cal. Penal Code Ann. §§ 6031–6031.2 (West Supp. 1978). Health inspectors are required to inspect prisons and provide reports to a number of officials, including the State Attorney General and the Board of Corrections. Cal. Health & Safety Code Ann. § 459 (West 1970). Fire officials are also required to inspect prisons. 15 Cal. Admin. Code § 1025 (1976). Following the reports of the suicide at the jail involved here, the County Board of Supervisors called for a report from the County Administrator; held a public hearing on the report, which was open to the media; and called for further reports when the initial report failed to describe the conditions in the cells in the Greystone portion of the jail.

Neither the First Amendment nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the government's control. Under our holdings in *Pell* v. *Procunier, supra,* and *Saxbe* v. *Washing-*

*ton Post Co., supra,* until the political branches decree otherwise, as they are free to do, the media have no special right of access to the Alameda County Jail different from or greater than that accorded the public generally.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings.

*Reversed and remanded.*

MR. JUSTICE MARSHALL and MR. JUSTICE BLACKMUN took no part in the consideration or decision of this case.

MR. JUSTICE STEWART, concurring in the judgment.

I agree that the preliminary injunction issued against the petitioner was unwarranted, and therefore concur in the judgment. In my view, however, KQED was entitled to injunctive relief of more limited scope.

The First and Fourteenth Amendments do not guarantee the public a right of access to information generated or controlled by government, nor do they guarantee the press any basic right of access superior to that of the public generally. The Constitution does no more than assure the public and the press equal access once government has opened its doors.* Accordingly, I agree substantially with what the opinion of THE CHIEF JUSTICE has to say on that score.

We part company, however, in applying these abstractions to the facts of this case. Whereas he appears to view "equal access" as meaning access that is identical in all respects, I believe that the concept of equal access must be accorded more flexibility in order to accommodate the practical distinctions between the press and the general public.

---

*Forces and factors other than the Constitution must determine what government-held data are to be made available to the public. See, *e. g.,* *New York Times Co.* v. *United States,* 403 U. S. 713, 728–730 (concurring opinion).

When on assignment, a journalist does not tour a jail simply for his own edification. He is there to gather information to be passed on to others, and his mission is protected by the Constitution for very specific reasons. "Enlightened choice by an informed citizenry is the basic ideal upon which an open society is premised . . . ." *Branzburg* v. *Hayes,* 408 U. S. 665, 726 (dissenting opinion). Our society depends heavily on the press for that enlightenment. Though not without its lapses, the press "has been a mighty catalyst in awakening public interest in governmental affairs, exposing corruption among public officers and employees and generally informing the citizenry of public events and occurrences . . . ." *Estes* v. *Texas,* 381 U. S. 532, 539. See *Mills* v. *Alabama,* 384 U. S. 214, 219; *Grosjean* v. *American Press Co.,* 297 U. S. 233, 250.

That the First Amendment speaks separately of freedom of speech and freedom of the press is no constitutional accident, but an acknowledgment of the critical role played by the press in American society. The Constitution requires sensitivity to that role, and to the special needs of the press in performing it effectively. A person touring Santa Rita jail can grasp its reality with his own eyes and ears. But if a television reporter is to convey the jail's sights and sounds to those who cannot personally visit the place, he must use cameras and sound equipment. In short, terms of access that are reasonably imposed on individual members of the public may, if they impede effective reporting without sufficient justification, be unreasonable as applied to journalists who are there to convey to the general public what the visitors see.

Under these principles, KQED was clearly entitled to some form of preliminary injunctive relief. At the time of the District Court's decision, members of the public were permitted to visit most parts of the Santa Rita jail, and the First and Fourteenth Amendments required the Sheriff to give members of the press *effective* access to the same areas. The Sheriff evidently assumed that he could fulfill this obligation simply

by allowing reporters to sign up for tours on the same terms as the public. I think he was mistaken in this assumption, as a matter of constitutional law.

The District Court found that the press required access to the jail on a more flexible and frequent basis than scheduled monthly tours if it was to keep the public informed. By leaving the "specific methods of implementing such a policy . . . [to] Sheriff Houchins," the court concluded that the press could be allowed access to the jail "at reasonable times and hours" without causing undue disruption. The District Court also found that the media required cameras and recording equipment for effective presentation to the viewing public of the conditions at the jail seen by individual visitors, and that their use could be kept consistent with institutional needs. These elements of the court's order were both sanctioned by the Constitution and amply supported by the record.

In two respects, however, the District Court's preliminary injunction was overbroad. It ordered the Sheriff to permit reporters into the Little Greystone facility and it required him to let them interview randomly encountered inmates. In both these respects, the injunction gave the press access to areas and sources of information from which persons on the public tours had been excluded, and thus enlarged the scope of what the Sheriff and Supervisors had opened to public view. The District Court erred in concluding that the First and Fourteenth Amendments compelled this broader access for the press.

Because the preliminary injunction exceeded the requirements of the Constitution in these respects, I agree that the judgment of the Court of Appeals affirming the District Court's order must be reversed. But I would not foreclose the possibility of further relief for KQED on remand. In my view, the availability and scope of future permanent injunctive relief must depend upon the extent of access then permitted the public, and the decree must be framed to accommodate

equitably the constitutional role of the press and the institutional requirements of the jail.

MR. JUSTICE STEVENS, with whom MR. JUSTICE BRENNAN and MR. JUSTICE POWELL join, dissenting.

The Court holds that the scope of press access to the Santa Rita jail required by the preliminary injunction issued against petitioner is inconsistent with the holding in *Pell* v. *Procunier,* 417 U. S. 817, 834, that "newsmen have no constitutional right of access to prisons or their inmates beyond that afforded the general public" and therefore the injunction was an abuse of the District Court's discretion. I respectfully disagree.

Respondent KQED, Inc., has televised a number of programs about prison conditions and prison inmates, and its reporters have been granted access to various correctional facilities in the San Francisco Bay area, including San Quentin State Prison, Soledad Prison, and the San Francisco County Jails at San Bruno and San Francisco, to prepare program material. They have taken their cameras and recording equipment inside the walls of those institutions and interviewed inmates. No disturbances or other problems have occurred on those occasions.

KQED has also reported newsworthy events involving the Alameda County Jail in Santa Rita, including a 1972 newscast reporting a decision of the United States District Court finding that the "shocking and debasing conditions which prevailed [at Santa Rita] constituted cruel and unusual punishment for man or beast as a matter of law." [1] On March 31, 1975, KQED reported the suicide of a prisoner in the Greystone portion of the Santa Rita jail. That program also carried a statement by a psychiatrist assigned to Santa Rita to the effect that condi-

---

[1] See *Brenneman* v. *Madigan,* 343 F. Supp. 128, 132–133 (ND Cal. 1972). Based on a personal visit to the facility, Judge Zirpoli reached the "inescapable conclusion . . . that Greystone should be razed to the ground."

tions in the Greystone facility were responsible for illnesses of inmates.[2]  Petitioner's disagreement with that conclusion was reported on the same newscast.

KQED requested permission to visit and photograph the area of the jail where the suicide occurred.  Petitioner refused, advising KQED that it was his policy not to permit any access to the jail by the news media.  This policy was also invoked by petitioner to deny subsequent requests for access to the jail in order to cover news stories about conditions and alleged incidents within the facility.[3]  Except for a carefully supervised tour in 1972, the news media were completely excluded from the inner portions of the Santa Rita jail until after this action was commenced.[4]  Moreover, the prison rules provided that all outgoing mail, except letters to judges and lawyers, would be inspected; the rules also prohibited any mention in outgoing correspondence of the names or actions of any correctional officers.

Respondents KQED, and the Alameda and Oakland branches of the National Association for the Advancement of Colored People,[5] filed their complaint for equitable relief on June 17,

---

[2] The psychiatrist was discharged after the telecast.

[3] Access was denied, for example, to cover stories of alleged gang rapes and poor physical conditions within the jail, Tr. 208, and of recent escapes from the jail, id., at 135–136.

[4] A previous sheriff had conducted one "press tour" in 1972, attended by reporters and cameramen.  But the facility had been "freshly scrubbed" for the tour and the reporters were forbidden to ask any questions of the inmates they encountered, App. 16–17.

[5] The NAACP alleged a "special concern with conditions at . . . Santa Rita, because the prisoner population at the jail is disproportionately black [and the members of the NAACP] depend on the public media to keep them informed of such conditions so that they can meaningfully participate in the current public debate on jail conditions in Alameda County."  Complaint, ¶ 3.
Since no special relief was requested by or granted to the NAACP, the parties have focused on the claim of KQED.

1975. The complaint alleged that petitioner had provided no "means by which the public may be informed of conditions prevailing in Greystone or by which prisoners' grievances may reach the public." It further alleged that petitioner's policy of "denying KQED and the public" access to the jail facility violated the First and Fourteenth Amendments to the Constitution and requested the court to enjoin petitioner "from excluding KQED news personnel from the Greystone cells and Santa Rita facilities and generally preventing full and accurate news coverage of the conditions prevailing therein." App. 6–7. With the complaint, respondents filed a motion for a preliminary injunction, supported by affidavits of representatives of the news media, the Sheriff of San Francisco County, and the attorney for respondents. The affidavits of the news media representatives and the Sheriff described the news coverage in other penal institutions and uniformly expressed the opinion that such coverage had no harmful consequences and in fact served a significant public purpose.[6]

In a letter to the County Board of Supervisors dated two days after this suit was instituted, petitioner proposed a pilot public tour program. He suggested monthly tours for 25 persons, with the first tentatively scheduled for July 14. The tours, however, would not include the cell portions of Greystone and would not allow any use of cameras or communication with inmates. The Board approved six such tours. Peti-

---

[6] The Sheriff had a master's degree in criminology from the University of California at Berkeley and 10 years' experience in law enforcement with the San Francisco Police Department. As Sheriff he had general supervision and control over the jail facilities in San Francisco. He expressed the "opinion, based on my education and experience in law enforcement and jail administration, that such programs make an important contribution to public understanding of jails and jail conditions. In my opinion jails are public institutions and the public has a right to know what is being done with their tax dollars being spent on jail facilities and programs." App. 15.

tioner then filed his answer and supporting affidavit explaining why he had refused KQED access to the jail and identifying the recent changes in policy regarding access to the jail and communication between inmates and persons on the outside. Petitioner stated that if KQED's request had been granted, he would have felt obligated to honor similar requests from other representatives of the press and this could have disrupted mealtimes, exercise times, visiting times, and court appearances of inmates.[7] He pointed out that the mail regulations had recently been amended to delete a prohibition against mentioning the names or actions of any correctional officers. With respect to the scope of the proposed tours, petitioner explained that the use of cameras would be prohibited because it would not be possible to prevent 25 persons with cameras from photographing inmates and security operations. Moreover, communication with inmates would not be permitted because of excessive time consumption, "problems with control" of inmates and visitors, and a belief "that interviewing would be excessively unwieldy."[8]

An evidentiary hearing on the motion for a preliminary injunction was held after the first four guided tours had taken place. The evidence revealed the inadequacy of the tours as a means of obtaining information about the inmates and their conditions of confinement for transmission to the public. The tours failed to enter certain areas of the jail.[9] They afforded no opportunity to photograph conditions within the facility,

---

[7] In contrast to the floodgate concerns expressed by petitioner, the Information Officer at San Quentin testified that after the liberalization of access rules at that institution media requests to enter the facility actually declined. Tr. 152. This testimony may suggest that the mere existence of inflexible access barriers generates a concern that conditions within the closed institution require especially close scrutiny.

[8] App. 24.

[9] The tour did not include Little Greystone, which was the subject of reports of beatings, rapes, and poor conditions, or the disciplinary cells.

and the photographs which the county offered for sale to tour visitors omitted certain jail characteristics, such as catwalks above the cells from which guards can observe the inmates.[10] The tours provided no opportunity to question randomly encountered inmates about jail conditions. Indeed, to the extent possible, inmates were kept out of sight during the tour, preventing the tour visitors from obtaining a realistic picture of the conditions of confinement within the jail. In addition, the fixed scheduling of the tours prevented coverage of newsworthy events at the jail.

Of most importance, all of the remaining tours were completely booked, and there was no assurance that any tour would be conducted after December 1975. The District Court found that KQED had no access to the jail and that the broad restraints on access were not required by legitimate penological interests.[11]

---

[10] There were also no photos of the women's cells, of the "safety cell," of the "disciplinary cells," or of the interior of Little Greystone. In addition, the photograph of the dayroom omits the television monitor that maintains continuous observation of the inmates and the open urinals.

[11] "Sheriff Houchins admitted that because Santa Rita has never experimented with a more liberal press policy than that presently in existence, there is no record of press disturbances. Furthermore, the Sheriff has no recollection of hearing of any disruption caused by the media at other penal institutions. Nevertheless Sheriff Houchins stated that he feared that invasion of inmates' privacy, creation of jail 'celebrities,' and threats to jail security would result from a more liberal press policy. While such fears are not groundless, convincing testimony was offered that such fears can be substantially allayed.

"As to the inmates' privacy, the media representatives commonly obtain written consent from those inmates who are interviewed and/or photographed, and coverage of inmates is never provided without their full agreement. As to pre-trial detainees who could be harmed by pre-trial publicity, consent can be obtained not only from such inmates but also from their counsel. Jail 'celebrities' are not likely to emerge as a result of a random interview policy. Regarding jail security, any cameras and equipment brought into the jail can be searched. While Sheriff Houchins

The District Court thereafter issued a preliminary injunction, enjoining petitioner "from denying KQED news personnel and responsible representatives of the news media access to the Santa Rita facilities, including Greystone, at reasonable times and hours," or from preventing such representatives "from utilizing photographic and sound equipment or from utilizing inmate interviews in providing full and accurate coverage of the Santa Rita facilities." The court, however, recognized that petitioner should determine the specific means of implementing the order and, in any event, should retain the right to deny access when jail tensions or other special circumstances require exclusion.

The United States Court of Appeals for the Ninth Circuit affirmed, holding that the District Court did not abuse its discretion in framing the preliminary injunction under review.[12] MR. JUSTICE REHNQUIST, acting as Circuit Justice, stayed the mandate and in his opinion on the stay application fairly stated the legal issue we subsequently granted certiorari to decide:

"The legal issue to be raised by applicant's petition for certiorari seems quite clear. If the 'no greater access' doctrine of *Pell* [v. *Procunier,* 417 U. S. 817,] and *Saxbe* [v. *Washington Post Co.,* 417 U. S. 843,] applies to this

---

expressed concern that photographs of electronic locking devices could be enlarged and studied in order to facilitate escape plans, he admitted that the inmates themselves can study and sketch the locking devices. Most importantly, there was substantial testimony to the effect that ground rules laid down by jail administrators, such as a ban on photographs of security devices, are consistently respected by the media.

"Thus upon reviewing the evidence concerning the present media policy at Santa Rita, the Court finds the plaintiffs have demonstrated irreparable injury, absence of an adequate remedy at law, probability of success on the merits, a favorable public interest, and a balance of hardships which must be struck in plaintiffs' favor." App. 69.

[12] 546 F. 2d 284 (1976).

case, the Court of Appeals and the District Court were wrong, and the injunction was an abuse of discretion. If, on the other hand, the holding in *Pell* is to be viewed as impliedly limited to the situation where there already existed substantial press and public access to the prison, then *Pell* and *Saxbe* are not necessarily dispositive, and review by this Court of the propriety of the injunction, in light of those cases, would be appropriate, although not necessary." 429 U. S. 1341, 1344.

For two reasons, which will be discussed separately, the decisions in *Pell* and *Saxbe* do not control the propriety of the District Court's preliminary injunction. First, the unconstitutionality of petitioner's policies which gave rise to this litigation does not rest on the premise that the press has a greater right of access to information regarding prison conditions than do other members of the public. Second, relief tailored to the needs of the press may properly be awarded to a representative of the press which is successful in proving that it has been harmed by a constitutional violation and need not await the grant of relief to members of the general public who may also have been injured by petitioner's unconstitutional access policy but have not yet sought to vindicate their rights.

## I

This litigation grew out of petitioner's refusal to allow representatives of the press access to the inner portions of the Santa Rita facility. Following those refusals and the institution of this suit, certain remedial action was taken by petitioner. The mail censorship was relaxed and an experimental tour program was initiated. As a preliminary matter, therefore, it is necessary to consider the relevance of the actions after March 31, 1975, to the question whether a constitutional violation had occurred.

It is well settled that a defendant's corrective action in

anticipation of litigation or following commencement of suit does not deprive the court of power to decide whether the previous course of conduct was unlawful. See *United States v. W. T. Grant Co.*, 345 U. S. 629, 632–633, and cases cited.[13] The propriety of the court's exercise of that power in this case is apparent. When this suit was filed, there were no public tours. Petitioner enforced a policy of virtually total exclusion of both the public and the press from those areas within the Santa Rita jail where the inmates were confined. At that time petitioner also enforced a policy of reading all inmate correspondence addressed to persons other than lawyers and judges and censoring those portions that related to the conduct of the guards who controlled their daily existence. Prison policy as well as prison walls significantly abridged the opportunities for communication of information about the conditions of confinement in the Santa Rita facility to the public.[14] Therefore,

---

[13] Moreover, along with the power to decide the merits, the court's power to grant injunctive relief survives the discontinuance of illegal conduct. "It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption." *United States v. Oregon Medical Soc.*, 343 U. S. 326, 333. When the District Court issued the preliminary injunction, there was no assurance that the experimental public tours would continue beyond the next month. Thus, it would certainly have been reasonable for the court to assume that, absent injunctive relief, the access to the inner portions of the Santa Rita facility would soon be reduced to its prelitigation level.

[14] Thus, when this suit was filed, there existed no opportunity for outsiders to observe the living conditions of the inmates at Santa Rita. And the mail regulations prohibited statements about the character of the treatment of prisoners by correctional officers.

I cannot agree with petitioner that the inmates' visitation and telephone privileges were reasonable alternative means of informing the public at large about conditions within Santa Rita. Neither offered an opportunity to observe those conditions. Even if a member of the general public or a representative of the press were fortunate enough to obtain the

even if there would not have been any constitutional violation had the access policies adopted by petitioner following commencement of this litigation been in effect all along, it was appropriate for the District Court to decide whether the restrictive rules in effect when KQED first requested access were constitutional.

In *Pell* v. *Procunier,* 417 U. S., at 834, the Court stated that "newsmen have no constitutional right of access to prisons or their inmates beyond that afforded the general public." But the Court has never intimated that a nondiscriminatory policy of excluding entirely both the public and the press from access to information about prison conditions would avoid

---

name of an inmate to visit, access to the facility would not have included the inmate's place of confinement. The jail regulations do not indicate that an inmate in the minimum-security portion of the jail may enlist the aid of Social Service officers to telephone the press or members of the general public to complain of the conditions of confinement. App. 38. Even if a maximum-security inmate may make collect telephone calls, it is unlikely that a member of the general public or representative of the press would accept the charges, especially without prior knowledge of the call's communicative purpose.

Although sentenced prisoners may not be interviewed under any circumstances, pretrial detainees may, according to petitioner, be interviewed with the consent of the inmate, defense counsel, and prosecutor, and with an order from the court. Not only would such an interview take place outside the confines of the jail, but the requirement of a court order makes this a patently inadequate means of keeping the public informed about the jail and its inmates.

Finally, petitioner suggests his willingness to provide the press with information regarding the release of prisoners which, according to petitioner, would permit interviews of former prisoners regarding the conditions of their recent confinement. This informal offer was apparently only made in response to respondents' lawsuit. Moreover, it too fails to afford the public any opportunity to observe the conditions of confinement.

Hence, the means available at the time this suit was instituted for informing the general public about conditions in the Santa Rita jail were, as a practical matter, nonexistent.

constitutional scrutiny.[15]    Indeed, *Pell* itself strongly suggests the contrary.

In that case, representatives of the press claimed the right to interview specifically designated inmates.   In evaluating this claim, the Court did not simply inquire whether prison officials allowed members of the general public to conduct such interviews.   Rather, it canvassed the opportunities already available for both the public and the press to acquire information regarding the prison and its inmates.   And the Court found that the policy of prohibiting interviews with inmates specifically designated by the press was "not part of an attempt by the State to conceal the conditions in its prisons."   *Id.,* at 830.   The challenged restriction on access, which was imposed only after experience revealed that such interviews posed disciplinary problems, was an isolated limitation on the efforts of the press to gather information about those conditions.   It was against the background of a record which demonstrated that both the press and the general public were "accorded full opportunities to observe prison conditions," [16]

---

[15] In *Zemel* v. *Rusk,* 381 U. S. 1, 17, the Court said:

"The right to speak and publish does not carry with it the *unrestrained* right to gather information."   (Emphasis added.)

And in *Branzburg* v. *Hayes,* 408 U. S. 665, 681:

"We do not question the significance of free speech, press, or assembly to the country's welfare.   Nor is it suggested that news gathering does not qualify for First Amendment protection; without some protection for seeking out the news, freedom of the press could be eviscerated."

Both statements imply that there is a right to acquire knowledge that derives protection from the First Amendment.   See *id.,* at 728 n. 4 (STEWART, J., dissenting).

[16] "The Department of Corrections regularly conducts public tours through the prisons for the benefit of interested citizens.   In addition, newsmen are permitted to visit both the maximum security and minimum security sections of the institutions and to stop and speak about any subject to any inmates whom they might encounter.   If security considerations permit, corrections personnel will step aside to permit such interviews to be confidential.   Apart from general access to all parts of the institu-

that the Court considered the constitutionality of the single restraint on access challenged in *Pell*.

The decision in *Pell*, therefore, does not imply that a state policy of concealing prison conditions from the press, or a policy denying the press any opportunity to observe those conditions, could have been justified simply by pointing to like concealment from, and denial to, the general public. If that were not true, there would have been no need to emphasize the substantial press and public access reflected in the record of that case.[17] What *Pell* does indicate is that the question whether respondents established a probability of prevailing on

tions, newsmen are also permitted to enter the prisons to interview inmates selected at random by the corrections officials. By the same token, if a newsman wishes to write a story on a particular prison program, he is permitted to sit in on group meetings and to interview the inmate participants." 417 U. S., at 830.

[17] Nor would it have been necessary to note, as the *Pell* opinion did, the fact that the First Amendment protects the free flow of information to the public:

"The constitutional guarantee of a free press 'assures the maintenance of our political system and an open society,' *Time, Inc.* v. *Hill,* 385 U. S. 374, 389 (1967), and secures 'the paramount public interest in a free flow of information to the people concerning public officials,' *Garrison* v. *Louisiana,* 379 U. S. 64, 77 (1964). See also *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964). By the same token, ' "[a]ny system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." ' *New York Times Co.* v. *United States,* 403 U. S. 713, 714 (1971); *Organization for a Better Austin* v. *Keefe,* 402 U. S. 415 (1971); *Bantam Books, Inc.* v. *Sullivan,* 372 U. S. 58, 70 (1963); *Near* v. *Minnesota ex rel. Olson,* 283 U. S. 697 (1931). Correlatively, the First and Fourteenth Amendments also protect the right of the public to receive such information and ideas as are published. *Kleindienst* v. *Mandel,* 408 U. S., at 762–763; *Stanley* v. *Georgia,* 394 U. S. 557, 564 (1969).

"In *Branzburg* v. *Hayes,* 408 U. S. 665 (1972), the Court went further and acknowledged that 'news gathering is not without its First Amendment protections,' *id.,* at 707, for 'without some protection for seeking out the news, freedom of the press could be eviscerated,' *id.,* at 681." *Id.,* at 832–833.

their constitutional claim is inseparable from the question whether petitioner's policies unduly restricted the opportunities of the general public to learn about the conditions of confinement in Santa Rita jail. As in *Pell*, in assessing its adequacy, the total access of the public and the press must be considered.

Here, the broad restraints on access to information regarding operation of the jail that prevailed on the date this suit was instituted are plainly disclosed by the record. The public and the press had consistently been denied any access to those portions of the Santa Rita facility where inmates were confined and there had been excessive censorship of inmate correspondence. Petitioner's no-access policy, modified only in the wake of respondents' resort to the courts, could survive constitutional scrutiny only if the Constitution affords no protection to the public's right to be informed about conditions within those public institutions where some of its members are confined because they have been charged with or found guilty of criminal offenses.

## II

The preservation of a full and free flow of information to the general public has long been recognized as a core objective of the First Amendment to the Constitution.[18] It is for this reason that the First Amendment protects not only the dissemination but also the receipt of information and ideas. See, *e. g., Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council,* 425 U. S. 748, 756; *Procunier* v. *Martinez,* 416 U. S. 396, 408–409; *Kleindienst* v. *Mandel,* 408 U. S. 753, 762–763.[19]

---

[18] See, *e. g., Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council,* 425 U. S. 748, 764–765; *Garrison* v. *Louisiana,* 379 U. S. 64, 77; *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 266–270; *Associated Press* v. *United States,* 326 U. S. 1, 20; *Grosjean* v. *American Press Co.,* 297 U. S. 233, 250. See also *Branzburg* v. *Hayes,* 408 U. S. 665, 726 n. 2 (STEWART, J., dissenting).

[19] See also *Lamont* v. *Postmaster General,* 381 U. S. 301; *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367, 390; *Stanley* v. *Georgia,* 394 U. S.

Thus, in *Procunier* v. *Martinez, supra,* the Court invalidated prison regulations authorizing excessive censorship of outgoing inmate correspondence because such censorship abridged the rights of the intended recipients. See also *Morales* v. *Schmidt,* 489 F. 2d 1335, 1346 n. 8 (CA7 1973). So here, petitioner's prelitigation prohibition on mentioning the conduct of jail officers in outgoing correspondence must be considered an impingement on the noninmate correspondent's interest in receiving the intended communication.

In addition to safeguarding the right of one individual to receive what another elects to communicate, the First Amendment serves an essential societal function.[20] Our system of self-government assumes the existence of an informed citizenry.[21] As Madison wrote:

"A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce

557, 564; *Martin* v. *City of Struthers,* 319 U. S. 141; *Marsh* v. *Alabama,* 326 U. S. 501.

[20] "What is at stake here is the societal function of the First Amendment in preserving free public discussion of governmental affairs. No aspect of that constitutional guarantee is more rightly treasured than its protection of the ability of our people through free and open debate to consider and resolve their own destiny. . . . It embodies our Nation's commitment to popular self-determination and our abiding faith that the surest course for developing sound national policy lies in a free exchange of views on public issues. And public debate must not only be unfettered; it must also be informed. For that reason this Court has repeatedly stated that First Amendment concerns encompass the receipt of information and ideas as well as the right of free expression." *Saxbe* v. *Washington Post Co.,* 417 U. S. 843, 862–863 (POWELL, J., dissenting).

[21] See A. Meiklejohn, Free Speech and Its Relation to Self-Government 26 (1948):

"Just so far as . . . the citizens who are to decide an issue are denied acquaintance with information or opinion or doubt or disbelief or criticism which is relevant to that issue, just so far the result must be ill-considered, ill-balanced planning, for the general good. *It is that mutilation of the thinking process of the community against which the First Amendment to the Constitution is directed.*"

or a Tragedy; or, perhaps both. Knowledge will forever govern ignorance: And a people who mean to be their own Governors, must arm themselves with the power which knowledge gives." 9 Writings of James Madison 103 (G. Hunt ed. 1910).

It is not sufficient, therefore, that the channels of communication be free of governmental restraints. Without some protection for the acquisition of information about the operation of public institutions such as prisons by the public at large, the process of self-governance contemplated by the Framers would be stripped of its substance.[22]

For that reason information gathering is entitled to some measure of constitutional protection. See, *e. g., Branzburg* v. *Hayes,* 408 U. S. 665, 681; *Pell* v. *Procunier,* 417 U. S., at 833.[23] As this Court's decisions clearly indicate, however, this protection is not for the private benefit of those who might qualify as representatives of the "press" but to insure that the citizens are fully informed regarding matters of public interest and importance.

In *Grosjean* v. *American Press Co.,* 297 U. S. 233, represent-

---

[22] Admittedly, the right to receive or acquire information is not specifically mentioned in the Constitution. But "the protection of the Bill of Rights goes beyond the specific guarantees to protect from . . . abridgement those equally fundamental personal rights necessary to make the express guarantees fully meaningful. . . . The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them. It would be a barren marketplace of ideas that had only sellers and no buyers." *Lamont* v. *Postmaster General,* 381 U. S., at 308 (BRENNAN, J., concurring). It would be an even more barren marketplace that had willing buyers and sellers and no meaningful information to exchange.

[23] See also *Branzburg* v. *Hayes, supra,* at 728 (STEWART, J., dissenting):

"No less important to the news dissemination process is the gathering of information. News must not be unnecessarily cut off at its source, for without freedom to acquire information the right to publish would be impermissibly compromised. Accordingly, a right to gather news, of some dimensions, must exist."

atives of the "press" challenged a state tax on the advertising revenues of newspapers. In the Court's words, the issue raised by the tax went "to the heart of the natural right of the members of an organized society, united for their common good, to impart and acquire information about their common interests." *Id.*, at 243. The opinion described the long struggle in England against the stamp tax and tax on advertisements— the so-called "taxes on knowledge":

> "[I]n the adoption of the [taxes] the dominant and con- trolling aim was to prevent, or curtail the opportunity for, the acquisition of knowledge by the people in respect of their governmental affairs. . . . The aim of the strug- gle [against those taxes] was . . . to establish and pre- serve the right of the English people to full information in respect of the doings or misdoings of their government. Upon the correctness of this conclusion the very charac- terization of the exactions as 'taxes on knowledge' sheds a flood of corroborative light. In the ultimate, an in- formed and enlightened public opinion was the thing at stake." *Id.*, at 247.

Noting the familiarity of the Framers with this struggle, the Court held:

> "[S]ince informed public opinion is the most potent of all restraints upon misgovernment, the suppression or abridgement of the publicity afforded by a free press cannot be regarded otherwise than with grave concern. The tax here involved is bad . . . because, in light of its history and of its present setting, it is seen to be a delib- erate and calculated device . . . to limit the circulation of information to which the public is entitled in virtue of the constitutional guaranties." *Id.*, at 250.

A recognition that the "underlying right is the right of the public generally" [24] is also implicit in the doctrine that "news-

---

[24] *Saxbe* v. *Washington Post Co.*, *supra*, at 864 (POWELL, J., dissenting).

men have no constitutional right of access to prisons or their inmates beyond that afforded the general public." *Pell* v. *Procunier, supra,* at 834. In *Pell* it was unnecessary to consider the extent of the public's right of access to information regarding the prison and its inmates in order to adjudicate the press claim to a particular form of access, since the record demonstrated that the flow of information to the public, both directly and through the press, was adequate to survive constitutional challenge; institutional considerations justified denying the single, additional mode of access sought by the press in that case.

Here, in contrast, the restrictions on access to the inner portions of the Santa Rita jail that existed on the date this litigation commenced concealed from the general public the conditions of confinement within the facility. The question is whether petitioner's policies, which cut off the flow of information at its source, abridged the public's right to be informed about those conditions.

The answer to that question does not depend upon the degree of public disclosure which should attend the operation of most governmental activity. Such matters involve questions of policy which generally must be resolved by the political branches of government.[25] Moreover, there are unquestionably occasions when governmental activity may properly be carried on in complete secrecy. For example, the public and the press are commonly excluded from "grand jury proceed-

---

[25] In *United States* v. *Nixon,* 418 U. S. 683, 705 n. 15, we pointed out that the Founders themselves followed a policy of confidentiality:

"There is nothing novel about governmental confidentiality. The meetings of the Constitutional Convention in 1787 were conducted in complete privacy. 1 M. Farrand, The Records of the Federal Convention of 1787, pp. xi–xxv (1911). Moreover, all records of those meetings were sealed for more than 30 years after the Convention. See 3 Stat. 475, 15th Cong., 1st Sess., Res. 8 (1818). Most of the Framers acknowledged that without secrecy no constitution of the kind that was developed could have been written. C. Warren, The Making of the Constitution 134–139 (1937)."

ings, our own conferences, [and] the meetings of other official bodies gathered in executive session . . . ." *Branzburg* v. *Hayes,* 408 U. S., at 684; *Pell* v. *Procunier,* 417 U. S., at 834.[26] In addition, some functions of government—essential to the protection of the public and indeed our country's vital interests—necessarily require a large measure of secrecy, subject to appropriate legislative oversight.[27] In such situations the reasons for withholding information from the public are both apparent and legitimate.

In this case, however, "[r]espondents do not assert a right to force disclosure of confidential information or to invade in any way the decisionmaking processes of governmental officials."[28] They simply seek an end to petitioner's policy of concealing prison conditions from the public. Those condi-

---

[26] In the case of grand jury proceedings, for example, the secrecy rule has been justified on several grounds:

" '(1) To prevent the escape of those whose indictment may be contemplated; (2) to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors; (3) to prevent subornation of perjury or tampering with the witnesses who may testify before grand jury and later appear at the trial of those indicted by it; (4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; (5) to protect innocent accused who is exonerated from disclosure of the fact that he has been under investigation, and from the expense of standing trial where there was no probability of guilt.' " *United States* v. *Procter & Gamble Co.,* 356 U. S. 677, 681–682, n. 6, quoting *United States* v. *Rose,* 215 F. 2d 617, 628–629 (CA3 1959).

[27] In *United States* v. *Nixon, supra,* we also recognized the valid need for protection of communications between high Government officials and those who advise and assist them in the performance of their manifold duties, explaining that "the importance of this confidentiality is too plain to require further discussion. Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process." 418 U. S., at 705.

[28] *Saxbe* v. *Washington Post Co.,* 417 U. S., at 861 (POWELL, J., dissenting).

tions are wholly without claim to confidentiality. While prison officials have an interest in the time and manner of public acquisition of information about the institutions they administer, there is no legitimate penological justification for concealing from citizens the conditions in which their fellow citizens are being confined.[29]

The reasons which militate in favor of providing special protection to the flow of information to the public about prisons relate to the unique function they perform in a democratic society. Not only are they public institutions, financed with public funds and administered by public servants,[30] they are an integral component of the criminal justice system. The citizens confined therein are temporarily, and sometimes permanently, deprived of their liberty as a result of a trial which must conform to the dictates of the Constitution. By express command of the Sixth Amendment the proceeding must be a "public trial." [31]  It is important not only that the

---

[29] The Court in *Saxbe* noted that " 'prisons are institutions where public access is generally limited.' " *Id.*, at 849 (citation omitted). This truism reflects the fact that there are legitimate penological interests served by regulating access, *e. g.*, security and confinement. But concealing prison conditions from the public is not one of those legitimate objectives. *Nixon* v. *Warner Communications, Inc.*, 435 U. S. 589, decided this Term, does not suggest a contrary conclusion. The effect of the Court's decision in that case was to limit the access by the electronic media to the Nixon tapes to that enjoyed by the press and the public at the time of the trial. That case presented "no question of a truncated flow of information to the public." *Id.*, at 609.

[30] "The administration of these institutions, the effectiveness of their rehabilitative programs, the conditions of confinement that they maintain, and the experiences of the individuals incarcerated therein are all matters of legitimate societal interest and concern." *Saxbe* v. *Washington Post Co.*, *supra*, at 861 (POWELL, J., dissenting).

[31] "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation . . . ." U. S. Const., Amdt. 6.

trial itself be fair, but also that the community at large have confidence in the integrity of the proceeding.[32] That public interest survives the judgment of conviction and appropriately carries over to an interest in how the convicted person is treated during his period of punishment and hoped-for rehabilitation. While a ward of the State and subject to its stern discipline, he retains constitutional protections against cruel and unusual punishment, see, *e. g., Estelle* v. *Gamble,* 429 U. S. 97, a protection which may derive more practical support from access to information about prisons by the public than by occasional litigation in a busy court.[33]

Some inmates—in Santa Rita, a substantial number—are pretrial detainees. Though confined pending trial, they have not been convicted of an offense against society and are entitled to the presumption of innocence. Certain penological objectives, *i. e.,* punishment, deterrence, and rehabilitation, which are legitimate in regard to convicted prisoners, are inapplicable to pretrial detainees.[34] Society has a special interest

---

[32] "The right to a public trial is not only to protect the accused but to protect as much the public's right to know what goes on when men's lives and liberty are at stake . . . ." *Lewis* v. *Peyton,* 352 F. 2d 791, 792 (CA4 1965). See also *In re Oliver,* 333 U. S. 257, 270: "The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power."

[33] In fact, conditions within the Greystone portion of the Santa Rita facility had been found to constitute cruel and unusual punishment. *Brenneman* v. *Madigan,* 343 F. Supp., at 132–133. The public's interest in ensuring that these conditions have been remedied is apparent. For, in final analysis, it is the citizens who bear responsibility for the treatment accorded those confined within penal institutions.

[34] "Incarceration after conviction is imposed to punish, to deter, and to rehabilitate the convict. . . . Some freedom to accomplish these ends must of necessity be afforded prison personnel. Conversely, where incarceration is imposed prior to conviction, deterrence, punishment, and retribution are not legitimate functions of the incarcerating officials. Their role is but a temporary holding operation, and their necessary freedom of action is concomitantly diminished. . . . Punitive measures in such a context are

in ensuring that unconvicted citizens are treated in accord with their status.

In this case, the record demonstrates that both the public and the press had been consistently denied any access to the inner portions of the Santa Rita jail, that there had been excessive censorship of inmate correspondence, and that there was no valid justification for these broad restraints on the flow of information. An affirmative answer to the question whether respondents established a likelihood of prevailing on the merits did not depend, in final analysis, on any right of the press to special treatment beyond that accorded the public at large. Rather, the probable existence of a constitutional violation rested upon the special importance of allowing a democratic community access to knowledge about how its servants were treating some of its members who have been committed to their custody. An official prison policy of concealing such knowledge from the public by arbitrarily cutting off the flow of information at its source abridges the freedom of speech and of the press protected by the First and Fourteenth Amendments to the Constitution.[35]

### III

The preliminary injunction entered by the District Court granted relief to KQED without providing any specific remedy for other members of the public. Moreover, it imposed duties on petitioner that may not be required by the Constitution itself. The injunction was not an abuse of discretion for either of these reasons.

---

out of harmony with the presumption of innocence." *Anderson* v. *Nosser,* 438 F. 2d 183, 190 (CA5 1971).

[35] When fundamental freedoms of citizens have been at stake, the Court has recognized that an abridgment of those freedoms may follow from a wide variety of governmental policies. See, *e. g., American Communications Assn.* v. *Douds,* 339 U. S. 382; *NAACP* v. *Alabama,* 357 U. S. 449; *Boyd* v. *United States,* 116 U. S. 616; *Grosjean* v. *American Press Co.,* 297 U. S. 233.

If a litigant can prove that he has suffered specific harm from the application of an unconstitutional policy, it is entirely proper for a court to grant relief tailored to his needs without attempting to redress all the mischief that the policy may have worked on others. Though the public and the press have an equal right to receive information and ideas, different methods of remedying a violation of that right may sometimes be needed to accommodate the special concerns of the one or the other. Preliminary relief could therefore appropriately be awarded to KQED on the basis of its proof of how it was affected by the challenged policy without also granting specific relief to the general public. Indeed, since our adversary system contemplates the adjudication of specific controversies between specific litigants, it would have been improper for the District Court to attempt to provide a remedy to persons who have not requested separate relief. Accordingly, even though the Constitution provides the press with no greater right of access to information than that possessed by the public at large, a preliminary injunction is not invalid simply because it awards special relief to a successful litigant which is a representative of the press.[36]

---

[36] Moreover, the relief granted to KQED will redound to the benefit of members of the public interested in obtaining information about conditions in the Santa Rita jail. The press may have no greater constitutional right to information about prisons than that possessed by the general public. But when the press does acquire information and disseminate it to the public, it performs an important societal function.

"In seeking out the news the press therefore acts as an agent of the public at large. It is the means by which the people receive that free flow of information and ideas essential to intelligent self-government. By enabling the public to assert meaningful control over the political process, the press performs a crucial function in effecting the societal purpose of the First Amendment." *Saxbe* v. *Washington Post Co.*, 417 U. S., at 863–864 (POWELL, J., dissenting).

See also *Branzburg* v. *Hayes*, 408 U. S., at 726–727 (STEWART, J., dissenting).

In the context of fashioning a remedy for a violation of rights protected

Nor is there anything novel about injunctive relief which goes beyond a mere prohibition against repetition of previous unlawful conduct. In situations which are both numerous and varied the chancellor has required a wrongdoer to take affirmative steps to eliminate the effects of a violation of law even though the law itself imposes no duty to take the remedial action decreed by the court.[37] It follows that if prison regulations and policies have unconstitutionally suppressed information and interfered with communication in violation of the First Amendment, the District Court has the power to require, at least temporarily, that the channels of communication be opened more widely than the law would otherwise require in order to let relevant facts, which may have been concealed, come to light. Whether or not final relief along the lines of that preliminarily awarded in this case would be "aptly tailored to remedy the consequences of the constitutional violation," *Milliken* v. *Bradley*, 433 U. S. 267, 287, it is perfectly clear that the court had power to enter an injunction which was broader than a mere prohibition against illegal conduct.

The Court of Appeals found no reason to question the specific preliminary relief ordered by the District Court. Nor is it appropriate for this Court to review the scope of the order.[38] The order was preliminary in character, and would have been subject to revision before the litigation reached a final conclusion.

I would affirm the judgment of the Court of Appeals.

---

by the First Amendment, consideration of the role of the press in our society is appropriate.

[37] For an extensive discussion of this practice in the context of desegregation decrees, see the Court's opinion last Term in *Milliken* v. *Bradley*, 433 U. S. 267.

[38] It should be noted, however, that the District Court was presented with substantial evidence indicating that the use of cameras and interviews with randomly selected inmates neither jeopardized security nor threatened legitimate penological interests in other prisons where such access was permitted. See *Procunier* v. *Martinez*, 416 U. S. 396, 414 n. 14.