**THE BALTIMORE SUN COMPANY, et al., Plaintiffs,**

v.

**Robert L. EHRLICH, Jr., etc, et al., Defendants.**

**No. CIV.WDQ–04–3822.**

United States District Court,
D. Maryland,
Northern Division.

Feb. 14, 2005.

Charles D. Tobin, Kara L. Daniels, Holland and Knight LLP, Washington, DC, Stephanie S. Abrutyn, New York City, for Plaintiff.

Cynthia Grams Peltzman, Margaret Ann Nolan, William F. Brockman, Office of the Attorney General, Baltimore, MD, for Defendants.

## MEMORANDUM OPINION AND ORDER

QUARLES, District Judge.

The Baltimore Sun Company, David Nitkin, a Sun reporter, and Michael Olesker, a Sun columnist (collectively, "the Sun") have sued Robert L. Ehrlich, Jr., the Governor of Maryland, Shareese DeLeaver, his Press Secretary, and Gregory Massoni, his Deputy Director of Communications and Press Secretary (collectively, "the Governor") for violation of the Sun's First and Fourteenth Amendment rights under the United States Constitution. Pending are the Sun's motion for a preliminary injunction and the Governor's motion to dismiss.[1] For the following reasons, the Sun's motion for preliminary injunction will be denied, and the Governor's motion to dismiss will be granted.

---

1. Also pending are the unopposed motion of the Maryland–Delaware–District of Columbia Press Association, and similar organizations to intervene as *amici curiae* in support of the plaintiffs' motion for a preliminary injunction and Leonard J. Kerpelman's petition to intervene as a third party counterclaimant against the Sun or as an *amicus curiae*. Kerpelman has been aggrieved by-*inter alia*—the Sun's alleged failure to cover his public access television appearances; employment discrimination against Jews; 60 per cent staff reduction; and nonlocal ownership. His petition has been opposed by the plaintiffs.

## I. THE ORDER

On November 18, 2004, the Governor's Press Office sent a memorandum to state public information offices and the Executive Department. Complaint at ¶ 16. The memorandum directed that

> *Effective immediately,* no one in the Executive Department or Agencies is to speak with David Nitkin or Michael Olesker until further notice. Do not return calls or comply with any requests. The Governor's Press Office feels that currently both are failing to objectively report on any issue dealing with the Ehrlich–Steele Administration. Please relay this information to your respective department heads. Any questions or concerns can be directed to the following contact information[.]

Complaint, Exhibit A (emphasis in original).

The memorandum was directed to a subset of the Executive Branch that includes the Governor and Lt. Governor (but excludes such other Executive Branch offices as Attorney General, Treasurer and Comptroller) and Executive agencies directly responsible to the Governor. *See* Governor's Supp. Memo., at 2–4, and authorities cited therein.

## II. THE EFFECTS OF THE ORDER

Since the memorandum, state government employees in the Governor's Office and agencies who regularly spoke to Mr. Nitkin when he contacted them for news gathering have refused to speak to him. Nitkin Declaration ("Decl.") at ¶ 13. For example, the Governor's press secretary, the State Budget Secretary, and a spokeswoman for the Department of General Services have refused comment to Mr. Nitkin about, respectively, statements made by legislators, the status of state employee health care costs, and a contract between a private consulting firm and the Department of General Services. *Id* at ¶¶ 14, 15,

and 16. Mr. Nitkin also fears that he may be deprived of such information as the dates of deer season, the number of leases entered into by the state and the total square footage of buildings leased, the number of West Nile cases and the success of the state's efforts to encourage West Nile reporting, and the staffing levels in "certain problematic juvenile centers." *Id.* at ¶ 18. Also, since the memorandum, "numerous state government representatives and employees" have not returned Mr. Nitkin's calls or "offered a personal reason or justification for declining [his] recent inquiries [or] stated or suggested it was their decision to do so." *Id.* at ¶¶ 17 and 20.

Mr. Olesker has had similar experiences. In the past, the State School Superintendent, Attorney General, Assistant Attorney General, the Secretary of Juvenile Services, the Governor's spokesperson on juvenile justice, state lottery officials and state police employees have provided information or views for his column. Olesker Decl. at ¶ 5. Mr. Olesker believes that the memorandum prohibits those persons from providing him with facts or their opinions. *Id.* at ¶ 6. Mr. Olesker believes that if he attempted to call various state agencies for such information as lead poisoning statistics, school graduation rates, and statistics about the aging, he would be unable to obtain that information. *Id.* at ¶ 8. Mr. Olesker also believes that the memorandum bars background discussions he has held with some public officials to identify issues or topics that could be of interest to his readers. *Id.* at ¶ 9. Since the memorandum, state personnel have not returned his telephone calls. *Id.* at ¶ 10.

It appears that the memorandum has not cut off all the Sun's access to public information. For example, on the day after the memorandum was circulated, the Governor informed Mr. Nitkin that Public

Information Act requests from him and Mr. Olesker were exempt from the memorandum and would continue to be answered. Corrected DeLeaver Affidavit at ¶¶ 4 and 6. Since the memorandum, Mr. Nitkin has attended at least three press conferences. *Id.* at ¶ 10. Press conferences are open to all members of the press and the public and are held in the Governor's Reception Room which holds 80 persons. *Id.* at ¶ 7. Press briefings are held with a limited number of the press in the Governor's conference room-which holds 10–12 persons-or some similar, small room; usually no more than five reporters are invited to press briefings. *Id.* at ¶ 7. It appears that Mr. Nitkin has been excluded from a press briefing.

## III. THE PRESS' RIGHT OF ACCESS

▇▇▇▇ An "untrammeled" press is necessary for the informed public opinion by which "mis-government" is restrained. *Houchins v. KQED*, 438 U.S. 1, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978) (citing *Grosjean v. American Press Co.*, 297 U.S. 233, 250, 56 S.Ct. 444, 80 L.Ed. 660 (1936)). The right to publish news is expansive. However, the right does not carry with it the unrestrained right to gather information. *Id.* at 12, 98 S.Ct. 2588. The Supreme Court has refused to recognize-or construct-a First Amendment right of access to all sources of information within governmental control. *Houchins*, supra, at 9, 98 S.Ct. 2588.[2] This reluctance is explained by the absence of constitutional standards governing the resolution of access disputes:

> There is no discernible basis for a constitutional duty to disclose, or for standards governing disclosure of or access to information. Because the Constitution affords no guidelines[,] ... hundreds of judges would, [in determining press access issues], be at large to fashion ad hoc standards, in individual cases, according to their own ideas of what seems "desirable" or "expedient."

*Houchins*, supra, at 13, 98 S.Ct. 2588.[3] Although the Constitution establishes the contest between the holders of government information and those seeking access to that information, it does not resolve it. *Id.* at 15, 98 S.Ct. 2588. The resolution of the inevitable conflicts between the holders of government information and those seeking access to that information is committed to "the tug and pull of the political forces in American society." *Id.*

---

**2.** Notwithstanding the *amicus* filings of the Maryland–Delaware–District of Columbia Press Association, et al, the press has not been unreservedly supportive of the plaintiffs' suit:

> But I don't see in the Constitution where anyone, even the governor, is obliged to answer the calls of a particular reporter. (Of course, press secretaries, who are paid to talk to the press, should have to talk to all comers.)
>
> \* \* \* \* \* \*
>
> Why should Ehrlich have to talk to a reporter he thinks is unfair?

"The Sun Should Rise Above Ehrlich's Pique," *Washington Post*, Dec 9, 2004 at B01.

**3.** Some journalists have also understood that courtrooms are inappropriate arenas for resolving these kinds of disputes:

> But the answer to Ehrlich's diktat won't be found in a courtroom. Suing the governor is no less grandstanding than Ehrlich's cynical appeal to voters who mistrust the news media. The Sun should make its case through quality journalism, not legal briefs. Reporting, not a desperate resort to the courts, will convince the public that it is the Sun, and not [the Governor] that is traveling the high road.

Ehrlich's Pique, *supra*. *The New York Times* has counseled that "[c]ooler heads should prevail in settling the standoff short of the courthouse." Marylanders' Right to Know. Jan 22, 2005.

The Fourth Circuit has similarly declined to recognize a journalist's right to have equal access to public information sources and to be treated the same as other journalists. *Snyder v. Ringgold, No. 97–1358, slip. op. at \*4 (4th Cir.1998), available at 1998 WL 13528.* Recognizing such a right would require the "large analytical leap from holding that government may not regulate or prohibit private speech on the basis of content or viewpoint to holding that government may not make 'content-based' distinctions between reporters in granting access to government information." *Id.* As the Fourth Circuit observed, recognizing such a right "would presumably preclude the ... widespread practice of public officials declining to speak to reporters whom they view as untrustworthy because the reporters have previously violated a promise of confidentiality or otherwise distorted their comments." *Id.*[4]

█ As the First and Fourteenth Amendments are currently understood in this Circuit, a government may lawfully make content-based distinctions in the way it provides press access to information not available to the public generally. *Id.*

## IV. THE REQUEST FOR A PRELIMINARY INJUNCTION

█ When reviewing a motion for a preliminary injunction, the court must consider (1) the likelihood of irreparable harm to the plaintiff if the relief is denied, (2) the likelihood of harm to the defendant if the requested relief is granted, (3) the likelihood that the plaintiff will succeed on the merits, and (4) the public interest. *Blackwelder Furniture Co. v. Seilig Mfg. Co.,* 550 F.2d 189, 193 (4th Cir.1977) *and Rum Creek Coal Sales, Inc. v. Caperton,* 926 F.2d 353, 359 (4th Cir.1991).

█ Ordinarily, a court should first address the balance of harms; if the alleged harm, however, is "inseparably linked to the plaintiff's claim of violation of First Amendment rights, the court must first analyze the plaintiff's likelihood of success on the merits." *Carandola, Ltd. v. Bason,* 303 F.3d 507, 511 (4th Cir.2002). The deprivation of a First Amendment right constitutes irreparable harm. *See Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). In determining whether the press has been deprived of such a right, the court must remember that the press does not enjoy special First Amendment rights that exceed those of ordinary citizens. *See Branzburg v. Hayes,* 408 U.S. 665, 684–85, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). As Judge Murnaghan observed:

> It must be borne in mind, at the outset, that the rights of the news media ... are co-extensive with and do not exceed those rights of the members of the public in general. Not infrequently, the purveyors of news stand in as surrogates for the other entities and persons comprising the public, but the scope of their rights is defined by the scope of the rights adhering to those for whom they purport to act.

*In re Greensboro News Co.,* 727 F.2d 1320, 1322 (4th Cir.1984).

█ It is clear from the Nitkin and Olesker declarations, that their complaints-e.g., refusal of officials to comment on statements of legislators, refusals to

---

4. As one journalist has observed:
> In the game of politics and journalism, elected officials curry favor with reporters they perceive to be sympathetic, plying them with access and leaks while stiffing hacks who are perceived to be antagonistic or aggressive. Reporters similarly cultivate sources. In general, those who talk tend to be characterized more sympathetically than those who don't.
>
> Ehrlich's Pique, *supra.*

comment on contracts between private firms and the state, refusals to provide information or views for columns, refusals to provide background discussions to identify issues or topics of interest to readers, and refusals to provide personal reasons or justifications for declining comment-are far beyond any citizen's reasonable expectations of access to his or her government. The enforcement of the Governor's memorandum has been implemented in a way that is reasonably calculated to ensure the Sun's access to generally available public information. The Sun seeks a privileged status beyond that of the private citizen; that desire is not a cognizable basis for injunctive relief. As the Sun can demonstrate neither irreparable harm nor the likelihood of success on the merits, its motion for a preliminary injunction must be denied.

## V. THE MOTION TO DISMISS

A Fed.R.Civ.P. 12(b)(6) motion to dismiss should be granted "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), (citing *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)); *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir.1982). All allegations are treated as true, and the complaint is viewed in the light most favorable to the plaintiff. *Mylan Laboratories, Inc. v. Raj Matkari, et. al.*, 7 F.3d 1130, 1134 (4th Cir.1993).

■ Because, as discussed above, the Sun seeks the declaration of a constitutional right that neither the Supreme Court nor the Fourth Circuit has recognized-and, in fact, seeks more access than that accorded a private citizen-the Governor's motion to dismiss will be granted.

## CONCLUSION

For the reasons discussed above, the Sun's motion for preliminary injunction will be denied, and the Governor's motion to dismiss will be granted.

## ORDER

For the reasons discussed in the accompanying Memorandum Opinion, it is this 14th day of February 2005, ORDERED that:

1. the Plaintiffs' motion for preliminary injunction BE, and HEREBY IS, DENIED;

2. the Defendants' motion to dismiss BE, and HEREBY IS, GRANTED;

3. the unopposed motion of the Maryland–Delaware–District of Columbia Press Association, and similar organizations to intervene as *amici curiae* BE, and HEREBY IS, GRANTED;

4. Mr. Kerpelman's petition to intervene is GRANTED in part (his *amicus* filings will remain a part of the papers in this action); and the remainder is DENIED;

5. the case BE, and HEREBY IS, CLOSED; and

6. the Clerk of the Court shall send copies of this Memorandum Opinion and Order to counsel for the parties.