PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

THE BALTIMORE SUN COMPANY;
DAVID NITKIN; MICHAEL OLESKER,
          *Plaintiffs-Appellants,*

v.

ROBERT L. EHRLICH, JR., in his
official capacity as Governor of
Maryland; SHAREESE DELEAVER, in
her official capacity as Press
Secretary to the Governor of
Maryland; GREGORY MASSONI, in his
official capacity as Deputy Director
of Communications and Press
Secretary to the Governor of
Maryland,
          *Defendants-Appellees.*

No. 05-1297

LEONARD J. KERPELMAN,
          *Movant,*

and

THE WASHINGTON POST; THE NEW
YORK TIMES COMPANY; TIME INC.;
THE ASSOCIATED PRESS; E. W.
SCRIPPS COMPANY; ADVANCE
PUBLICATIONS, INCORPORATED; CABLE
NEWS NETWORK, LP, LLLP; THE
MARYLAND DELAWARE DISTRICT OF
COLUMBIA PRESS ASSOCIATION;

AMERICAN SOCIETY OF NEWSPAPER
EDITORS; NEWSPAPER ASSOCIATION OF
AMERICA; THE ASSOCIATION OF
CAPITOL REPORTERS AND EDITORS;
THE REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS; SOCIETY OF
PROFESSIONAL JOURNALISTS; THE
NORTH CAROLINA PRESS ASSOCIATION;
THE SOUTH CAROLINA PRESS
ASSOCIATION; VIRGINIA PRESS
ASSOCIATION,
          *Amici Supporting Appellants.*

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
William D. Quarles, Jr., District Judge.
(CA-04-3822-1-WDQ)

Argued: November 29, 2005

Decided: February 15, 2006

Before NIEMEYER, LUTTIG, and TRAXLER, Circuit Judges.

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Luttig and Judge Traxler joined.

## COUNSEL

**ARGUED:** Charles D. Tobin, HOLLAND & KNIGHT, Washington, D.C., for Appellants. Margaret Ann Nolan, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees. **ON BRIEF:** Judith F. Bonilla, HOLLAND & KNIGHT, Washington, D.C.; Rachel E. Fugate, HOL-

LAND & KNIGHT, Tampa, Florida, for Appellants. J. Joseph Curran, Jr., Attorney General of Maryland, Cynthia G. Peltzman, Assistant Attorney General, William F. Brockman, Assistant Attorney General, Baltimore, Maryland, for Appellees. Kevin T. Baine, Adam L. Perlman, Zoe C. Scharff, WILLIAMS & CONNOLLY, L.L.P., Washington, D.C., for Amici Supporting Appellants.

## OPINION

NIEMEYER, Circuit Judge:

The Press Office of Maryland Governor Robert L. Ehrlich, Jr. issued the following directive on November 18, 2004:

> Effective *immediately*, no one in the Executive Department or Agencies is to speak with [Baltimore Sun reporter] David Nitkin or [Baltimore Sun columnist] Michael Olesker until further notice. Do not return calls or comply with any requests. The Governor's Press Office feels that currently both are failing to objectively report on any issue dealing with the Ehrlich-Steele Administration. Please relay this information to your respective department heads.

The directive was authored by Deputy Director of Communications Gregory Massoni and disseminated to "Public Information Offices and Executive Department" by Press Secretary Shareese DeLeaver.

The Baltimore Sun Company (publisher of *The Sun* newspaper), Baltimore Sun reporter Nitkin, and Baltimore Sun columnist Olesker (collectively referred to as "The Sun") commenced this action in December 2004 against Ehrlich, Massoni, and DeLeaver (collectively, the "Governor"), seeking preliminary and permanent injunctions against enforcement of the directive. In its claim, brought under 42 U.S.C. § 1983, The Sun alleges that the Governor's directive unconstitutionally retaliated against it for exercising its First Amendment speech and press rights.

The district court denied The Sun's motion for a preliminary injunction and granted the Governor's motion to dismiss the com-

plaint for failure to state a claim upon which relief can be granted. For the reasons that follow, we affirm.

I

*The Sun* is Maryland's largest newspaper with more than one million readers each week. David Nitkin, a reporter for the Baltimore Sun Company, was the State House Bureau Chief, and Michael Olesker was a columnist for the Baltimore Sun Company, who wrote a weekly opinion column.

These plaintiffs allege in their complaint that the Governor issued his November 18, 2004 directive "for the express purpose of punishing and retaliating against The Sun for the exercise of its First Amendment rights." They also allege that the directive "was intended to have and has had an impermissible chilling effect on The Sun's right to free expression."

In support of The Sun's motion for a preliminary injunction, Nitkin testified by affidavit about the effect that the Governor's directive had on him. He stated that on November 22, 2004, he called the Governor's Press Secretary, Henry Fawell, to seek comment on statements made by legislators calling for a constitutional amendment to give lawmakers a greater say in selling state-owned land. Fawell's response was that "the ban is still in effect." Nitkin also stated that on the same day he left a message for Budget Secretary James DiPaula and that DiPaula's secretary informed him that Nitkin would have to speak to the Governor's Press Office. Nitkin stated that on November 23, 2004, he called Anne Hubbard, a spokeswoman for the Department of General Services, inquiring about a contract between a private consulting firm and the Department of General Services, and Hubbard replied, "David, I can't talk to you." Nitkin related that "numerous [other] state government representatives and employees also have not returned my telephone calls." And in a second affidavit, Nitkin stated that he was excluded from a "press briefing" conducted in the Governor's conference room on December 30, 2004, and that he was not invited to one on January 4, 2005. He acknowledged that other reporters from The Sun attended both briefings.

On the same day that the Governor's directive was issued, Nitkin e-mailed the Governor's Press Office to learn if the directive applied

to his requests for information made pursuant to Maryland's Public Information Act. The Press Office responded to Nitkin, advising him that executive officials would continue to answer those requests "as legally required."

Finally, invitations were extended to Nitkin for public press conferences, and he attended three of them during the two months following the issuance of the directive. He also continued to receive public press releases.

In his affidavit in support of The Sun's motion for preliminary injunction, Olesker testified that "since the ban was enacted, several state government representatives and employees have not returned my telephone calls." He stated that on November 29, 2004, he made three telephone calls to the Governor's Press Office that were not returned.

The Baltimore Sun Company itself has apparently not been denied any access by the directive except insofar as Nitkin and Olesker have been denied access. Other reporters for *The Sun* have had their phone messages and e-mails returned, and they attended and reported on both press briefings from which Nitkin was excluded or not invited.

In affidavits filed in opposition to The Sun's motion for a preliminary injunction, Massoni and DeLeaver explained the reach of the Governor's directive. Massoni testified that both before the directive and after it, the Governor interacted with members of the media in a variety of ways, including "press conferences, press briefings, and exclusive interviews which may be limited in scope, participants, or forum." He observed that these practices were "consistent with well-established custom within the broadcast industry, and have not changed during this administration, except to the extent that Mr. Nitkin and Mr. Olesker are not granted the special access they once enjoyed." He further testified,

> Based on my years of experience in the broadcast industry, it is common practice for public officials to determine to whom they will speak, to speak to one or a selected number of reporters and to decide in what forum the information will be disclosed. Based on my experience, it is not uncom-

mon for a public official to refuse to provide information, or to limit access to sources of information to a reporter.

DeLeaver testified by affidavit that the Governor determines whether to hold a public press conference or a press briefing of a limited number of reporters. She explained that public press conferences were held in the Governor's reception room, which has a capacity for 80 persons, and the media could request to be included on the e-mail notification list. Because Nitkin had requested to be on the notification list, he was notified of and invited to public press conferences. Olesker never requested to be on the notification list. She stated that press briefings were held in the Governor's conference room, a private area "protected by a guard and a door with keypad access" and with the capacity to hold 10 to 12 people. The persons invited to press briefings were called by telephone or invited in person.

The Sun has not maintained — and so confirmed at oral argument — that the Governor's directive actually chilled its reporting on state government matters. The Governor pointed out that during the eight weeks before the directive, Nitkin wrote 45 articles related to state government and Olesker 1, and during the eight weeks after the directive, Nitkin wrote 43 and Olesker 1.

The Sun commenced this action on December 3, 2004, against Governor Ehrlich, Massoni, and DeLeaver in their official capacities, alleging unconstitutional retaliation and seeking preliminary and permanent injunctions barring the Governor from enforcing the November 18, 2004 directive. The district court entered an order on February 14, 2005, denying The Sun's motion for a preliminary injunction and granting the Governor's motion under Federal Rule of Civil Procedure 12(b)(6) to dismiss the complaint for failure to state a claim upon which relief can be granted. *Baltimore Sun Co. v. Ehrlich*, 356 F. Supp. 2d 577, 578 (D. Md. 2005). In its decision, the court stated that "because . . . The Sun seeks the declaration of a constitutional right that neither the Supreme Court nor the Fourth Circuit has recognized — and, in fact, seeks more access than that accorded a private citizen — the Governor's motion to dismiss will be granted." *Id.* at 582. The district court relied on the same reasoning to deny The Sun's motion for a preliminary injunction. *Id.*

This appeal followed.

## II

Because the district court's order dismissing The Sun's complaint under Federal Rule of Civil Procedure 12(b)(6) and its order denying The Sun's motion for a preliminary injunction are based on the single legal determination that The Sun has failed to state a claim for retaliation upon which relief can be granted, we review that legal determination *de novo*. *See Carandola, Ltd. v. Bason*, 303 F.3d 507, 511 (4th Cir. 2002) (holding that review of legal issues determined in deciding a motion for preliminary injunction is *de novo*); *Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000) (holding that review of order granting motion to dismiss under Rule 12(b)(6) is *de novo*).

The Sun contends that the district court erred in straying from the issue presented by the motions and that the Governor's brief continues its "effort to mislead this Court" about the case. The Sun asks us to decide: "Did [The Sun] state a cause of action by alleging that a public official retaliated and discriminated against [it] because he did not like [its] point of view"? It argues that the allegation in its complaint "clearly satisfied [the Fourth Circuit's] standards for retaliation claims." Thus, we address the single issue whether the issuance of the Governor's November 18, 2004 directive in response to The Sun's exercise of its First Amendment rights gives rise to an actionable claim for retaliation under the First and Fourteenth Amendments and 42 U.S.C. § 1983.

Because government retaliation tends to chill an individual's exercise of his First Amendment rights, public officials may not, as a general rule, respond to an individual's protected activity with conduct or speech even though that conduct or speech would otherwise be a lawful exercise of public authority. *Bd. of County Comm'rs v. Umbehr*, 518 U.S. 668, 674 (1996); *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000); *see also Perry v. Sindermann*, 408 U.S. 593, 597 (1972) ("[I]f the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited"). A retaliation claim under 42 U.S.C. § 1983 must establish

that the government responded to the plaintiff's constitutionally pro-
tected activity with conduct or speech that would chill or adversely
affect his protected activity. *See Constantine v. Rectors and Visitors
of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005); *ACLU v.
Wicomico County*, 999 F.2d 780, 785 (4th Cir. 1993). The determina-
tion of whether government conduct or speech has a chilling effect or
an adverse impact is an objective one — we determine whether a sim-
ilarly situated person of "ordinary firmness" reasonably would be
chilled by the government conduct in light of the circumstances pre-
sented in the particular case. *See Constantine*, 411 F.3d at 500;
*Wicomico County*, 999 F.2d at 786; *see also Thaddeus-X v. Blatter*,
175 F.3d 378, 398 (6th Cir. 1999) (tailoring adverse impact analysis
to specific circumstances presented). Because our analysis of the
adverse impact is objective, it can be resolved as a matter of law.

"Not every [government] restriction," however, "is sufficient to
chill the exercise of First Amendment rights, nor is every restriction
actionable, even if retaliatory." *DiMeglio v. Haines*, 45 F.3d 790, 806
(4th Cir. 1995). Illustrating the observation that "not every [govern-
ment] restriction is sufficient to chill the exercise of First Amendment
rights," we have recognized a distinction between an adverse impact
that is *actionable*, on the one hand, and a *de minimis* inconvenience,
on the other. "[A] plaintiff seeking to recover for retaliation must
show that the defendant's conduct resulted in something more than a
'*de minimis* inconvenience' to her exercise of First Amendment
rights." *Constantine*, 411 F.3d at 500 (citation omitted). Thus, in
*Wicomico County*, we held that a prison's "decision to withdraw from
its special arrangement [permitting an ACLU paralegal to meet with
prisoners in private] . . . may have inconvenienced Appellees, but it
did not chill, impair, or deny their exercise of First Amendment
rights" because the paralegal was still "free to visit with inmates in
secure, non-contact meeting rooms," which was "all that [the prison]
provide[d] to any paralegal or other non-professional visitor." 999
F.2d at 786.

In a proximate vein, the Supreme Court has condoned limiting
retaliation liability when the challenged government action, whether
conduct or speech, is so pervasive, mundane, and universal in govern-
ment operations that allowing a plaintiff to proceed on his retaliation
claim would "plant the seed of a constitutional case" in "virtually

every" interchange. *See Connick v. Myers*, 461 U.S. 138, 148-49 (1983); *see also id.* at 143 (holding that, in the government employment context, public employers can reprimand or punish employees for their speech when that speech does not touch on matters of public concern); *Kirby v. City of Elizabeth City*, 388 F.3d 440, 448-49 (4th Cir. 2004); *cf. Umbehr*, 518 U.S. at 675 (noting that retaliation "may be justified [i.e., unactionable] when legitimate countervailing government interests are sufficiently strong"). Thus, the *Connick* Court recognized that the retaliation cause of action must be administered to balance governmental and private interests so as not to impose liability in everyday, run-of-the-mill encounters.

Illustrating the second *DiMeglio* observation that not "every restriction [is] actionable, even if retaliatory," we have recognized that some government actions, due to their nature, are not actionable even if they satisfy all the generally articulated elements of a retaliation claim. When the challenged government action is government speech, there is no retaliation liability — even if the plaintiff can demonstrate a substantial adverse impact — unless the government speech concerns "private information about an individual" or unless it was "threatening, coercive, or intimidating so as to intimate that punishment, sanction, or adverse regulatory action will imminently follow." *Suarez*, 202 F.3d at 689. Other courts, likewise, have held that there is no retaliation when the government's alleged retaliatory action was government speech. *See, e.g.*, *Benningfield v. City of Houston*, 157 F.3d 369, 376-77 (5th Cir. 1998); *Harrington v. Harris*, 118 F.3d 359, 366 (5th Cir. 1997); *accord Kirby*, 388 F.3d at 450 n.8 (leaving open the question whether a government-employer's "oral reprimand" might be a sanction or adverse regulatory action sufficient to chill future speech). This limitation on the retaliation cause of action based on government speech is necessary to balance the government's speech interests with the plaintiff's speech interests. *Suarez*, 202 F.3d at 688-89.

In this case, the Governor does not dispute that Nitkin and Olesker engaged in constitutionally protected speech and that he issued the November 18, 2004 directive in response to their speech. The directive itself states that the Governor and his Press Office believed that Nitkin and Olesker had failed to be objective in their reporting. The issues not conceded by the Governor center on the remaining ele-

ments of a retaliation claim, requiring us to determine in the context of this case (1) whether making issuance of the directive actionable would tend to constitutionalize virtually every day-to-day interchange between the press and the Governor; (2) whether the directive effected a substantial adverse impact or chill on The Sun's exercise of its First Amendment rights or simply created a *de minimis* inconvenience; and (3) whether the Governor's response was protected government speech.

On these issues, The Sun contends that the directive was not an everyday interchange but specifically targeted two reporters, denying them rights given to all other reporters. The Sun argues that Nitkin and Olesker are relatively and significantly worse off than other reporters because executive officials no longer can comment to them. Although the reporters would not concede at oral argument that their speech has *actually* been chilled, they argue that as a matter of law the speech of *a reasonable reporter of ordinary firmness* would be chilled by being subjected to a no-comment policy that does not apply to every reporter. In addition, The Sun contends that the Governor intended his order to coerce Nitkin and Olesker to conform their speech to his understanding of objective reporting. Thus, The Sun argues that from the moment the order issued and regardless of its effectiveness in foreclosing their access to official sources of information, a reasonable reporter's speech would be chilled by the Governor's manifest and expressed purpose.

## III

It is common knowledge — and the parties so concede — that reporting is highly competitive, and reporters cultivate access — sometimes exclusive access — to sources, including government officials. Public officials routinely select among reporters when granting interviews or providing access to nonpublic information. They evaluate reporters and choose to communicate with those who they believe will deliver their desired messages to the public. By giving one reporter or a small group of reporters information or access, the official simultaneously makes other reporters, who do not receive discretionary access, worse off. These other reporters are sometimes denied access because an official believes them to be unobjective. *See Snyder v. Ringgold*, 133 F.3d 917, 1998 WL 13528 *1, *4 (4th Cir. 1998)

(unpublished opinion) (noting the "common and widely accepted practice among politicians of granting an exclusive interview to a particular reporter" and "the equally widespread practice of public officials declining to speak to reporters whom they view as untrustworthy because the reporters have previously violated a promise of confidentiality or otherwise distorted their comments").

At oral argument, The Sun conceded that a public official's selective preferential communication to his favorite reporter or reporters would not give the much larger class of unrewarded reporters retaliation claims. This concession acknowledges that government officials frequently and without liability evaluate reporters and reward them with advantages of access — i.e., that government officials regularly subject all reporters to some form of differential treatment based on whether they approve of the reporters' expression. The Sun nonetheless claims that this concession is not incompatible with affording it the relief requested in this case of enjoining the enforcement of the Governor's November 18, 2004 directive.

We, however, find the scenario conceded by The Sun and the facts of this case to be materially indistinguishable. Both the hypothetical and this case are merely two different ways of describing the same pervasive and everyday relationship between government officials and the press, and retaliation liability cannot hinge on the conclusory statements with which a plaintiff frames a complaint about a single example of how that relationship has played out. Both the hypothetical and the facts of this case present instances in which government officials disadvantage some reporters because of their reporting and simultaneously advantage others by granting them unequal access to nonpublic information. Thus, whether the disfavored reporters number two or two million, they are still denied access to discretionarily afforded information on account of their reporting. The facts of this case and the hypothetical stand or fall together, so The Sun's concession forecloses its requested relief.

That The Sun concluded it had to make this unavailing concession also demonstrates that the challenged government response is a pervasive feature of journalism and of journalists' interaction with government. Having access to relatively less information than other reporters on account of one's reporting is so commonplace that to allow The

Sun to proceed on its retaliation claim addressing that condition would "plant the seed of a constitutional case" in "virtually every" interchange between public official and press. *See Connick v. Myers*, 461 U.S. 138, 149 (1983). Accordingly, we conclude that, in the circumstances of this case, no actionable retaliation claim arises when a government official denies a reporter access to discretionarily afforded information or refuses to answer questions.

IV

For reasons similar in nature to those supporting the conclusion that the pervasiveness of the Governor's conduct in the daily, mundane operations of government — i.e., giving preferential access to some reporters and refusing to give access to or answer the questions of other reporters — generally renders the conduct not actionable under *Connick*, we also conclude that the adverse impact of such conduct is objectively *de minimis*. It would be inconsistent with the journalist's accepted role in the "rough and tumble" political arena to accept that a reporter of ordinary firmness can be chilled by a politician's refusal to comment or answer questions on account of the reporter's previous reporting. *Cf. Eaton v. Meneley*, 379 F.3d 949, 956 (10th Cir. 2004) ("Our case law recognizes that the nature of political debate is rough and tumble. Plaintiffs in public debates are expected to cure most misperceptions about themselves through their own speech and debate").

Moreover, the evidence in this case shows that Nitkin and Olesker in particular have not been chilled from expressing themselves;[1] they continue to write as frequently as before the issuance of the Governor's directive, despite the inconvenience of relying on and scrutinizing other sources to garner comments from the Maryland executive department. We of course recognize that we must measure the adverse impact against an objectively reasonable plaintiff. Nonethe-

---

[1]At oral argument, the reporters' counsel, when pressed by the court, would not concede that Nitkin and Olesker have been chilled in this case, claiming that they needed "discovery" to find out if their clients have been chilled. But such a claim makes no more sense than claiming that a personal injury plaintiff needed discovery to find out if he had been injured when the defendant crashed into his car.

less, "the plaintiff's actual response to the retaliatory conduct provides some evidence of the tendency of that conduct to chill First Amendment activity." *Constantine*, 411 F.3d at 500. Nitkin's and Olesker's actual response attests to the *de minimis* impact that the Governor's directive would have on reporters of ordinary firmness. As typical reporters, they are used to currying their sources' favors, and even though they may have been foreclosed from directly accessing sources when the sources became unhappy with how their information was being reported, they have not been chilled to any substantial degree in their reporting, as they have continued to write stories for *The Sun*, to comment, to criticize, and otherwise to speak with the full protection of the First Amendment.

The Sun argues at some length in its brief that it is not seeking to change the competition for access, in which it is daily favored and disfavored by government officials' decisions to give access to a particular reporter. It accepts that competition and its daily successes and failures as inherent in the journalistic terrain. In the words of its brief, it seeks *only* and "simply" to "lift the retaliatory ban" — the November 18, 2004 directive. But the November 18, 2004 directive, which is no more than a formalization of the Governor's decision not to give Nitkin and Olesker access, has no greater impact than would the same decision made daily by the Governor on an *ad hoc* basis.

Notwithstanding The Sun's acknowledgment that daily successes and failures in obtaining access have an insignificant effect on reporting, it now attempts to recharacterize the failures of Nitkin and Olesker to obtain access as the product of an unconstitutional retaliation:

> On behalf of the public, journalists strive to obtain information from knowledgeable sources and observe events directly. . . . Direct interviews of government sources permit journalists to probe for insight, challenge official statements and press releases, and uncover previously-undisclosed information. Any news organization or journalist sentenced — as *The Sun*'s journalists were — to reliance upon second-hand sources, official releases and carefully-spun responses at press conferences would be greatly disadvantaged in its efforts to report the news. Fairly read in the light most

favorable to [The Sun], the Complaint therefore alleges a chilling effect on similarly-situated persons 'of ordinary firmness.'

While Nitkin and Olesker might now be disfavored, they are no more disfavored than the many reporters without access to the Governor.

We cannot accept that the Governor's directive — which, to be sure, has increased the public's awareness of the competition for access — created a chilling effect any different from or greater than that experienced by The Sun and by all reporters in their everyday journalistic activities. Accordingly, we conclude that in the ongoing intercourse of government and press, a reporter endures only *de minimis* inconvenience when a government official denies the reporter access to discretionary information or refuses to answer the reporter's questions because the official disagrees with the substance or manner of the reporter's previous expression in reporting.

V

The Sun contends alternatively that the Governor openly expressed a malicious intent to chill its speech and that the Governor's speech expressing such intent would alter a reasonable reporter's speech. In its complaint, The Sun alleges that the Governor specifically intended to chill Nitkin and Olesker, for he later invoked a "combat metaphor," describing publicly his directive as "the only arrow in [his] quiver." As The Sun now argues:

The Governor has boasted of his effort to chill Mr. Nitkin's and Mr. Olesker's exercise of free speech through the use of "an arrow" in the Governor's "quiver." As a result, other journalists or members of the public now must worry that they, too, may be banned from receiving basic government information if they express views divergent from official executive policy.

Of course, a public official's malicious intent, taken alone, cannot amount to a retaliatory response. The plaintiff in a retaliation case must challenge adverse *conduct* or *speech*. *See Constantine*, 411 F.3d

at 500 (repeating that retaliation claims challenge government "conduct"). Thus, we understand The Sun to be arguing that it has been adversely affected by the Governor's speech insofar as his speech was hostile to and in open disagreement with The Sun's reporting, and, therefore, this expressed hostility — i.e. the hostile intent inferred from his explanation for the directive — would have a chilling effect on a reporter of ordinary firmness.

As speech, however, the Governor's comments were protected by the First Amendment, as were the reporters' statements about which the Governor was commenting. *Suarez*, 202 F.3d at 687. Although the speech of both the Governor and reporter are protected, the Governor's speech could still have given rise to a retaliation claim if it concerned private information about the reporter or any individual or was "threatening, coercive, or intimidating *so as to intimate that punishment, sanction, or adverse regulatory action [would] imminently follow.*" *Suarez*, 202 F.3d at 689 (emphasis added).

In this case, however, we conclude that the Governor's expressed pique, criticism, and explanation of his directive as the "only arrow" do not intimate that Nitkin or Olesker would imminently be subjected to punishment, sanction, or adverse regulatory action. Indeed, the Governor's explanation tended to suggest that his *only* arrow was to deny discretionary access and refuse to answer questions and that no further action would be taken against Nitkin and Olesker. And, of course, it is not maintained that the Governor's speech divulged private information.

Apart from the arrow-and-quiver explanation, the Governor's directive itself not only indicated his objection to The Sun's reporting and his intent not to talk to Nitkin and Olesker, but it also directed his subordinates in their official conduct and speech. As speech reflecting the Governor's own views and intent, the directive is not actionable because it is only the Governor's opinion and because he himself need not talk to reporters. As an internal directive, it extended only to the official conduct and speech of others in the executive branch.[2]

---

[2]The extent to which the Governor's order chills the employees' constitutionally permissible speech, see *Connick v. Myers*, 461 U.S. 138 (1983) and *Pickering v. Bd. of Ed.*, 391 U.S. 563 (1968), is not before us in this case. The Sun has expressly disclaimed that it represents the employees' third-party interests or that it is asserting third-party claims for these employees.

Because it neither communicated a threat to The Sun, nor divulged private information in its function as an internal directive, it is not actionable. *See Suarez*, 202 F.3d at 689.

For all of the reasons given, the judgment of the district court is

*AFFIRMED*.