Opinion for the Court filed by Senior Circuit Judge RANDOLPH, with whom Circuit Judge ROGERS and Senior Circuit Judge WILLIAMS join except as to Part II.
Opinion concurring in part and concurring in the judgment filed by Circuit Judge ROGERS.
Opinion concurring in part and concurring in the judgment filed by Senior Circuit Judge WILLIAMS.
*1089 RANDOLPH, Senior Circuit Judge:
The government’s appeal, and the inter-venors’ cross-appeal, are from the district court’s orders releasing video recordings made at the United States Naval Base, Guantanamo Bay, Cuba. The recordings are of military personnel removing a detainee from his cell, transporting him to a medical unit, and force-feeding him to keep him alive while he was on a hunger strike.
The government classified these recordings as “SECRET” because disclosing them could damage the national security. The district court decided that under the Constitution the public has a right to view the recordings because the detainee’s attorney filed some of them under seal, at which point the recordings became part of the court’s record. The government’s appeal is on the ground that the public has no such constitutional right. The interve-nors’ cross-appeal is on the ground that several categories of redactions the court approved prior to public release were too extensive.
I.
The case began when Abu Wa’el (Jihad) Dhiab filed a petition for a writ of habeas corpus to prevent the government from force-feeding him. The district court denied Dhiab’s motion for a preliminary injunction, finding that it lacked habeas jurisdiction to correct conditions of confinement. Dhiab v. Obama, 952 F.Supp.2d 154, 155 (D.D.C. 2013). On appeal, a panel of this court held that a Guantanamo ha-beas petitioner may seek not only relief from confinement, the traditional remedy in habeas corpus, but also an injunction to alter the conditions of his confinement. Aamer v. Obama, 742 F.3d 1023, 1033 (D.C. Cir. 2014).[1]
On remand, Dhiab moved again for a preliminary injunction, this time challenging particular government force-feeding practices. He also filed an emergency application for a temporary restraining order. The district court denied both motions. Dhiab v. Obama, 74 F.Supp.3d 16, 19 (D.D.C. 2014); Order, Dhiab v. Obama, No. 05-01457 (GK), (D.D.C. June 16, 2014), ECF No. 254. In considering Dhiab’s motions, the district court ordered the government to provide Dhiab’s attorney, who had been given a security clearance, copies of 'the video recordings, the existence of which the government had disclosed. After the government complied with the order, to which it objected, Dhiab’s attorney filed some of the recordings under seal.[2]
The government recorded Dhiab’s removal from his cell and his force-feeding in order to train military guards about how to handle detainees in such circumstances. In classifying each recording as “SECRET,” we shall assume that the government complied with Executive Order No. 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009).[3] This Executive Order, and those of past Presidents, see Dep’t of Navy v. Egan, 484 U.S. 518, *1090 527-28, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988), specified three levels of classified national security information: “TOP SECRET,” “SECRET,” and “CONFIDENTIAL.” The “SECRET” classification is reserved for “information, the unauthorized disclosure of which reasonably could be expected to cause serious damage to the national security” of the United States. Exec. Order No. 13,526 § 1.2(a)(2). Unauthorized disclosure of such classified information can be a federal criminal offense. See, e.g., 18 U.S.C. § 793.
Press organizations — sixteen of them— sought to intervene in Dhiab’s habeas case and asked the district court to unseal the recordings Dhiab’s attorney had filed. Their motion asserted that under the First Amendment, and common law, the public had a right to see these recordings because the recordings had become part of the record of Dhiab’s habeas corpus proceeding. The government did not oppose their intervention motion but it did oppose the organizations’ motion to unseal the recordings. In support of its opposition, the government filed declarations from military officers explaining how release of the classified recordings would threaten national security.
In October 2014, the district court granted the organizations’ motion to intervene and their motion to unseal the recordings, subject to further proceedings to determine what portions of the recordings should be redacted to protect information identifying government personnel. Dhiab v. Obama, 70 F.Supp.3d 486, 501 (D.D.C. 2014).
In December of that year, the government released Dhiab from Guantanamo and transferred him to the control of the government of Uruguay, thus rendering hjs habeas petition moot.
Our court nevertheless heard the government’s appeal from the district court’s October 2014 order unsealing the recordings and determined that we lacked appellate jurisdiction. We lacked appellate jurisdiction because the district court’s ruling was not an appealable final order or an appealable collateral order in light of further proceedings the court had scheduled. Dhiab v. Obama, 787 F.3d 563, 565-66 (D.C. Cir. 2015). We encouraged the district court on remand to consider the government’s additional declarations, filed in support of a stay of the unsealing order pending that appeal. Id. at 567. These new declarations “set out the harm associated with release of the videotapes in considerably more detail” than the earlier ones. Id.
When the case returned to the district court, it denied the government’s motion for reconsideration and, over the government’s objection, ordered the recordings[4] released after the government redacted identifying information such as faces, voices and names of government personnel. Dhiab v. Obama, 141 F.Supp.3d 23, 28-29 (D.D.C. 2015). By then Dhiab was no longer at Guantanamo.[5] Even so, the inter-venors persisted in their objections to some of the redactions and sought reinstatement of some of the deleted audio portions of the recordings or a transcript and subtitles.[6] The district court denied *1091 the intervenors’ motion regarding redaction, Dhiab v. Obama, 151 F.Supp.3d 28, 29 (D.D.C. 2015), ordered the redacted recordings unsealed on or before January 11, 2016, and granted a stay pending this appeal and cross-appeal, Order, Dhiab v. Obama, No. 05-01457 (GK), (D.D.C. Jan. 4, 2016), ECF No. 418.
II.
The intervenors’ claim that the Constitution requires this national security information, properly classified as “SECRET,” to be divulged to the world because a lawyer representing a Guantanamo detainee filed some of the recordings under seal in his client’s now-moot habeas corpus action is untenable. It is important to bear in mind that the Constitution gives “the President as head of the Executive Branch and as Commander in Chief’ the “authority to classify and control access to information bearing on national security....” Egan, 484 U.S. at 527, 108 S.Ct. 818.
Through the years our government has been steadfast in protecting information that, if made public, would jeopardize the security of the United States. Statutes, longstanding regulations, comprehensive Executive Orders, rules of the Chief Justice of the United States, local rules and practices of the federal courts — and more, enforce and support the President’s constitutional duty to prevent our government’s secret information from seeing the light of day, in judicial proceedings or otherwise.
Here the government established that the recordings of Dhiab were properly classified as “SECRET.” The district court did not rule otherwise, and the intervenors did not claim, let alone show, that the classifications were improper. The government submitted declarations, about which more later, demonstrating the harm that would result from releasing any of these recordings, redacted or not.
Yet the intervenors insist that under the First Amendment, classified information submitted under seal in a judicial proceeding becomes fair game for a judicial disclosure order, such as the one the district court issued in this case. Neither the First Amendment nor any other provision of the Constitution stands for such a principle.
The intervenors rely heavily on Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 8-9, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986).[7] This Press-Enterprise II decision will not bear the weight they place on it. The Supreme Court framed the question in Press-Enterprise II this way: whether the public had “a First Amendment right of access to the transcript of a preliminary hearing growing out of a criminal prosecution.” Id. at 3, 106 S.Ct. 2735. The Court put the question in terms of the public’s right because the “First Amendment generally grants the press no right to information about a trial superior to that of the general public.” Nixon v. Warner Commc’ns, Inc., 435 U.S. 589, 609-10, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978) (citing Estes v. Texas, 381 U.S. 532, 589, 85 S.Ct. 1628, 14 *1092 L.Ed.2d 543 (1965) (Harlan, J., concurring); Saxbe v. Washington Post Co., 417 U.S. 843, 94 S.Ct. 2811, 41 L.Ed.2d 514 (1974); Pell v. Procunier, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); and Zemel v. Rusk, 381 U.S. 1, 16-17, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965)).
Press-Enterprise II discovered a constitutional right in the public, although it was a qualified one: such proceedings may be sealed but only if “specific, on the record findings are made demonstrating that ‘closure is essential to preserve higher values and is narrowly tailored to serve that interest.’ ” 478 U.S. at 13-14, 106 S.Ct. 2735 (quoting Press-Enterprise Co. v. Super. Ct. (Press-Enterprise I), 464 U.S. 501, 510, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (considering the closure of voir dire in a criminal trial)). The district court invoked this formulation in ordering the classified Guantanamo recordings unsealed. Dhiab, 70 F.Supp.3d at 493.
Press-Enterprise II is not comparable to this case. Two differences are immediately apparent. When the Court wrote of the importance of public access to evidentiary proceedings it could not possibly have had in mind classified national security information. The case came up from a California state court. In criminal cases in California a preliminary hearing functioned “much like a full-scale trial.” 478 U.S. at 7, 106 S.Ct. 2735. The sealed record in Press-Enterprise II consisted of testimony and exhibits relating to murder charges, not classified material. Id. at 4, 106 S.Ct. 2735.
The second difference is just as obvious. Unlike Dhiab’s case, which was civil in nature,[8] the underlying action in Press-Enterprise II was a criminal prosecution. When it comes to classified national security information the Supreme Court has decided that the distinction makes a difference. See United States v. Reynolds, 345 U.S. 1, 12, 73 S.Ct. 528, 97 L.Ed. 727 (1953). In criminal cases, the government initiates the prosecution. Access and disclosure rights in criminal cases “do not endanger the government’s paramount interest in national security. The government’s interest can be protected by dismissal of the prosecution or less drastic concessions by the government in a criminal case.” Bruce E. Fein, Access to Classified Information: Constitutional and Statutory Dimensions, 26 Wm. & Mary L. Rev. 805, 828 (1985).[9] Matters are quite different in civil cases: “the Government is not the moving party, but is a defendant....” Reynolds, 345 U.S. at 12, 73 S.Ct. 528. For this reason, the Court in Reynolds held that the rationale behind access to national security information in criminal cases had “no application in a civil forum.” Id.[10] For *1093 the same reason, a noted commentator concluded that “plaintiffs suing the United States enjoy no right of access to classified information pertinent to the litigation.” Fein, supra, at 828.
There are additional reasons why Press-Enterprise II does not apply to this case. To reach its result, the Supreme Court recounted the English tradition of public criminal trials, beginning — the Court wrote — before the Norman conquest.[11] Press-Enterprise II, 478 U.S. at 8, 106 S.Ct. 2735. Although the Court did not say as much, the idea apparently was that the Framers of the First Amendment must have had this history in the back of their collective minds. See Globe Newspaper Co. v. Super. Ct., 457 U.S. 596, 604-05, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982).[12] The Court cited no historical evidence supporting that proposition and the wording of the First Amendment reveals no such understanding, as the Court itself acknowledged in an earlier opinion. Id. at 604, 102 S.Ct. 2613. “With neither the constraint of text nor the constraint of historical practice, nothing would separate the judicial task of constitutional interpretation from the political task of enacting laws currently deemed essential.” In re Reporters Comm. for Freedom of the Press, 773 F.2d 1325, 1332 (D.C. Cir. 1985) (Scalia, J.).
In habeas corpus cases, there is no tradition of public access comparable to that recounted in Press-Enterprise II with respect to criminal trials.[13] Habeas corpus proceedings do not involve juries. Since the beginning they have been decided by judges. Early English courts were in session for only a few months each year. Paul D. Halliday, Habeas Corpus: From England to Empire 355 n.79 (2010)..Yet from the fifteenth to eighteenth century, English courts regularly adjudicated habeas petitions between sessions. Id. at 56-57. At such times the English judges required jailers to make their returns to the writ to the judge’s private chambers or to the judge’s home. Id. at 54. The judge then made his habeas decision in private. Id. *1094 Between 1500 and 1800, about one-fifth of the writs the judges of England issued required the jailer make the return to chambers. Id. Although English judges more frequently requested returns to chambers during the vacations, the practice also occurred during terms of court. Id. The Habeas Corpus Act of 1679, which Blackstone described as the bulwark of English liberties, 1 William Blackstone, Commentaries on the Laws of England 133 (1765), expressly authorized the courts to issue writs of habeas corpus during vacations, thus continuing this longstanding practice. 31 Car. 2 c. 2.
Of course in this country, proceedings in open court are the norm, although there are well-established exceptions. See, e.g., In re Motions of Dow Jones & Co., 142 F.3d at 502-05. But of importance here is not just the absence of any “unbroken, uncontradicted history” of public attendance at habeas corpus proceedings in eighteenth-century England. Richmond Newspapers, 448 U.S. at 573, 100 S.Ct. 2814 (Burger, C.J., plurality opinion). More significant is that from the beginning of the republic to the present day, there is no tradition of publicizing secret national security information involved in civil cases, or for that matter, in criminal cases.[14] The tradition is exactly the opposite.[15]
To appreciate this one need only consider what occurs when classified information might be revealed during an oral argument in our courtroom. In such cases the court’s security officer “seals” the courtroom— that is, excludes the public, including the press. This is done not only in criminal appeals but also in civil cases. The procedures followed are those the Chief Justice of the United States has prescribed to protect classified information in criminal cases pursuant to the Classified Information Procedures Act. 18 U.S.C. app. 3 § 9 note (Security Procedures Established Pursuant to Pub. L. No. 96-456, 94 Stat. 2025, by the Chief Justice of the United States for the Protection of Classified Information). One may be confident that over many years none of the members of our court, past and present, ever supposed that in complying with the Chief Justice’s rules, we were somehow violating the Constitution.
Add to United States v. Reynolds, already mentioned, the case of Totten v. United States, 92 U.S. 105, 23 L.Ed. 605 (1875).[16] Both of these civil cases are well-known instances in the long history of protecting national security secrets of the United States.[17] Reynolds held that in a suit against the government, the plaintiff had no right to discover military or state *1095 secrets; the privilege against revealing such information was, the Court wrote, “well established.” 345 U.S. at 6-7, 73 S.Ct. 528. The Court in Reynolds described its 1875 decision in Totten as having dismissed a civil suit, the subject of which was a “state secret.” Id. at 11 n.26, 73 S.Ct. 528. In Reynolds, even if the plaintiffs’ need for the information had been “compelling,” no showing of necessity could justify a court order requiring the government to reveal “military secrets.” Id. at 11, 73 S.Ct. 528. Relying on Reynolds, our court has held that in order to protect national security information, the district court “need only be satisfied that there is a reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged.” Halkin v. Helms, 598 F.2d 1, 9 (D.C. Cir. 1978) (internal quotation and emphasis omitted).
The government also discusses cases arising under the Freedom of Information Act. Although this legislation requires much government information to be disclosed to the public, Congress expressly exempted properly classified information. 5 U.S.C. § 552(b)(1). To determine whether the government’s classification was proper, the court may review the document itself, but only ex parte and in camera, see 5 U.S.C. § 552(a)(4)(B)—that is, in private — as we mentioned in a case dealing with information regarding detainees at Guantanamo. ACLU v. Dep’t of Def., 628 F.3d 612, 626-27 (D.C. Cir. 2011). If the government had properly classified the document, the litigant, and hence the public, had no right to see it.
In Boumediene v. Bush, the case establishing the right of Guantanamo detainees to bring habeas actions, the Court thought the unique proceedings it was authorizing might risk “widespread dissemination of classified information.” 553 U.S. 723, 796, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008). To guard against this the Court wrote that the government “has a legitimate interest in protecting sources and methods of intelligence gathering; and we expect that the District Court will use its discretion to accommodate this interest to the greatest extent possible. Cf. United States v. Reynolds, 345 U.S. 1, 10, 73 S.Ct. 528, 97 L.Ed. 727 (1953) (recognizing an evidentiary privilege in a civil damages case where ‘there is a reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged’).” Boumediene, 553 U.S. at 796, 128 S.Ct. 2229.
To that end, Guantanamo habeas proceedings have' been litigated under orders designed to protect classified information. See, e.g., In re Guantanamo Bay Detainee Litig., 577 F.Supp.2d 143 (D.D.C. 2008). These protective orders require not only that classified information be maintained under seal, but also that counsel (with a security clearance) not disclose classified information at any hearing or proceeding. Id. at 150, 153. The government informs us that Guantanamo habeas cases routinely involve closed sessions to protect classified information from the public eye. Appellants’ Reply Br. at 20. Dhiab’s case is no exception: in his habeas proceedings, the district court held an evidentiary hearing from which the public was excluded. Id. at 21.
As against this, the intervenors are unable to cite a single case in which a court— other than the district court here — found that the First Amendment compelled public disclosure of properly classified national security information in a habeas proceeding, or in any other type of civil proceeding.
Press-Enterprise II spoke of a need to take into account “experience and logic” in determining whether the First Amendment required a record of a judicial pro *1096 ceeding to be released to the world. 478 U.S. at 9, 106 S.Ct. 2735. The “experience” in habeas corpus cases and in cases involving classified documents have already been discussed.
As to “logic,” it is important to remember that logic does not give starting points. First principles do. For this case the starting point was established at the Founding. The preamble to the Constitution gives equal billing to the national defense and “the Blessings of Liberty.” U.S. Const. pmbl. As the Supreme Court stated, there is no higher value than the security of the nation, a value the Court deemed a “compelling interest.” Haig v. Agee, 453 U.S. 280, 307, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981) (internal quotation omitted).
Press-Enterprise II therefore does not apply to this case and neither the interve-nors nor the public at large have a right under the First Amendment to receive properly classified national security information filed in court during the pendency of Dhiab’s petition for a writ of habeas corpus.
III.
Even if the intervenors had a qualified First Amendment right of access to the Dhiab recordings, we would still reverse the district court’s decision. The court’s ruling that the government failed to show a “substantial probability” of harm to a higher value was clear error.[18] Press-Enterprise II, 478 U.S. at 14, 106 S.Ct. 2735 (internal quotation omitted).
The government identified multiple ways in which unsealing these recordings would likely impair national security. Two of these risks — detainees triggering forcible encounters and developing countermeasures — together and individually, were enough to prevent these recordings from becoming public. The government’s declarations explained that the recordings would enable detainees, assisted by outside militants, to develop countermeasures to the guards’ cell-extraction and enteral-feeding techniques. The district court dismissed this prospect because the government had “already released substantial information” about these procedures and the detainees were already “intimately familiar” with them. Dhiab, 70 F.Supp.3d at 497-98. The government’s declarations contradict the court’s assessment. The recordings of the feeding process contain “significantly more information than previously released imagery,” Declaration of Rear Admiral Kyle J. Cozad, October 15, 2014, ¶ 4, and the publicly released information about cell extractions was outdated and described techniques not being used at Guantanamo. Id. ¶¶ 5-6. The recordings also show elements of the procedures that “take place outside the detainee’s presence” or “shielded from the detainee or otherwise obstructed from view.” Declaration of Rear Admiral Richard W. Butler, ¶ 12; Declaration of Rear Admiral Kyle J. Cozad, November 26, 2014, ¶ 9.
The government’s expert judgment was that militants could study the recordings repeatedly and slowly, looking for “patterns” of “mistakes” not identifiable from first-hand experience or written descriptions. Id. ¶ 14. Even if the recordings contained no new information, the government thus demonstrated good cause for *1097 sealing them. Information gleaned from the recordings could reach current detainees, who communicate with family members and other outside persons and have some access to outside media. Id. ¶ 6. Militants could also use the recordings to train fighters the government may capture and detain in the future. Id. ¶ 18. When detainees resist what are already hazardous procedures for the guards, this could further endanger government personnel at Guantanamo. Guards have been kicked, grabbed, punched, knocked down, bitten, and sprayed with bodily fluids. Id. ¶ 7. The government’s interest in ensuring safe and secure military operations clearly overcomes any qualified First Amendment right of access.
Rear Admiral Richard W. Butler identified a related danger: “If video recordings of forced cell extractions, or portions thereof, must be released to the public, detainees would surely become aware of this, and some likely would respond by refusing to comply with requests of the guard force in the hope that such resistance would result in forced cell extractions that would be recorded by video and released to the public, thus providing terrorist elements with propaganda to fuel their continued global hostilities against the United States.” Declaration of Rear Admiral Richard W. Butler, ¶ 18.
At the time of his declaration, Rear Admiral Butler was the Commander of the Joint Task Force-Guantanamo. He made his declaration on personal knowledge. The district court, calling his statement “speculative,” thought it knew better. Dhiab, 70 F.Supp.3d at 500. According to the court, detainees will not act as predicted because the court’s decision will not give all “detainees the unilateral right to publicize recordings.” Id. at 501. This misses an important point. The concern was that other detainees will believe courts may disclose recordings of their behavior. Needless to say, the district court had no day-to-day experience with the people being detained at Guantanamo and had no special insight into their mindset. Rear Admiral Butler did.
The government also explained in detail the risk that extremists would use the recordings to incite violence against American troops abroad and as propaganda to recruit fighters. The recordings are “particularly subject to use” because they depict “a forcible interaction between ... personnel and the detainees.” Declaration of Rear Admiral Sinclair M. Harris, ¶ 12. Images are more provocative than written or verbal descriptions. Extremists have used Guantanamo Bay imagery in their propaganda and in carrying out attacks on Americans. Id. ¶¶ 8,10. For example, the Islamic State beheaded American journalists wearing orange jumpsuits commonly associated with Guantanamo Bay detainees. Id. ¶ 8. In his forced final statement before his execution, Steven Sotloff, one of the journalists, was forced to mention the continued operation of Guantanamo as a reason why he was about to be murdered. Id.
The district court disregarded this evidence as legally irrelevant under the “heckler’s veto” line of cases, which prevents the government from censoring speech because the speech may provoke violence or offend others. See Dhiab, 70 F.Supp.3d at 500 (citing Forsyth Cty. v. Nationalist Movement, 505 U.S. 123, 134-35, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992)). Those cases are irrelevant. The government cited this substantial probability of harm to national security in order to overcome a qualified First Amendment right of access, not as a justification for suppressing speech. Risks of violent attacks by third parties against a cooperating defendant can justify sealing a plea agreement. See Washington Post v. Robinson, 935 *1098 F.2d 282, 291-92 (D.C. Cir. 1991). And the government unquestionably can classify documents based on the risk our enemies will use them to incite violence. Judicial Watch, Inc. v. United States Department of Defense, 715 F.3d 937, 943 (D.C. Cir. 2013), so held.
It bears repeating that the government “has a compelling interest in protecting ... the secrecy of information important to our national security....” McGehee, 718 F.2d at 1143 (quoting Snepp v. United States, 444 U.S. at 509 n.3, 100 S.Ct. 763 (per curiam) (emphasis and alteration in original)). See also C.I.A. v. Sims, 471 U.S. 159, 175, 105 S.Ct. 1881, 85 L.Ed.2d 173 (1985); United States v. Yunis, 867 F.2d 617, 623 (D.C. Cir. 1989). The district court did not disagree with the “SECRET” classification of these recordings, and neither did the intervenors. By definition, “the unauthorized disclosure of [the recordings] reasonably could be expected to cause serious damage to the national security.” Executive Order No. 13,526 § 1.2(a)(2). The district court had no basis for ruling that publicly releasing the recordings could not be expected to cause such harm.
The district court did not reach the intervenors’ common-law claim because it ruled in their favor on the basis of the First Amendment. Dhiab, 70 F.Supp.3d at 492 n.2; see Nixon v. Warner Commc’ns, Inc., 435 U.S. at 598-99, 98 S.Ct. 1306. The law of this circuit is that the need to “guard against risks to national security interests” overcomes a common-law claim for access. United States v. Hubbard, 650 F.2d 293, 315-16 (D.C. Cir. 1980). Because keeping the recordings sealed is narrowly tailored to protect the government’s compelling interest in guarding national security, intervenors cannot prevail on their common-law claim. See Wash. Post, 935 F.2d at 288 n.7; see also McVeigh, 119 F.3d at 812.
Because the recordings will remain sealed, the intervenors’ cross-appeal about the extent of the redactions is dismissed as moot.

Reversed.

. There is a conflict in the circuits regarding whether complaints about conditions of confinement are cognizable in habeas cases. Aamer, 742 F.3d at 1036-38. See also Nettles v. Grounds, 830 F.3d 922, 933 (9th Cir. 2016); Spencer v. Haynes, 774 F.3d 467, 470 n.6 (8th Cir. 2014).

. The classified recordings were sealed as required by the general protective order governing all Guantanamo Bay detainee litigation. In re Guantanamo Bay Detainee Litig., 577 F.Supp.2d 143, 153 (D.D.C. 2008). The district court issued a supplemental protective order governing the recordings. That order prevented Dhiab’s counsel from sharing the recordings with counsel representing detainees who were not challenging the forcible cell-extraction and enteral-feeding procedures.

.The intervenors did not claim, let alone establish, that the classification of the recordings was improper. The district court expressed no opinion on the subject.

.There is some discrepancy about the number of recordings at issue. The district court’s initial opinion referred to twenty-eight recordings already on file, but noted that the government had provided Dhiab with an additional four recordings. Dhiab, 70 F.Supp.3d at 492. The opinions on remand refer to thirty-two recordings. Dhiab v. Obama, 141 F.Supp.3d 23, 27 (D.D.C. 2015); Dhiab v. Obama, 151 F.Supp.3d 28, 29 (D.D.C. 2015).

. Dhiab did not file a brief in this appeal.

. The government first redacted a mutually selected sample of ten recordings — eight of the thirty-two recordings produced during litigation and a compilation recording created *1091 by each parly. In addition to covering guards' faces, uniform patches and other unique identifiers, the government muted the audio whenever a guard was speaking. After viewing the set of eight redacted recordings, Dhiab's counsel objected to the muting of guards’ voices and requested that the audio redactions be limited. In the alternative, Dhiab's counsel requested the addition of subtitles and the simultaneous release of a transcript. The intervenors, who have not seen the recordings, joined this motion.

. See Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 558-81, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) (opinion of Chief Justice Burger, joined by Justices White and Stevens), id. at 584-98, 100 S.Ct. 2814 (opinion of Justice Brennan, joined by Justice Marshall).

. See, e.g., Fay v. Noia, 372 U.S. 391, 423, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), deciding that the writ of habeas corpus is a "civil remedy for the enforcement of the right to personal liberty” not "a stage of” a criminal proceeding.

. The Classified Information Procedures Act, 18 U.S.C. app. 3, (CIPA) governs the handling of classified evidence in criminal proceedings. CIPA was enacted to limit the practice of criminal defendants threatening to disclose classified information in order to force the government to dismiss the charges. Under CIPA the court may review the admissibility of classified evidence at a preliminary hearing held in camera. Id. § 6(a). If the classified information is admissible, the government can suggest a substitute for the information or concede the fact the information tends to prove. Id. § 6(c). If the court rejects these measures, the government may declassify the information or dismiss the prosecution. Id. § 6(e).

.We also have recognized the difference between criminal and civil proceedings: "Neither the Supreme Court nor this Court has applied the [First Amendment right of access] outside the context of criminal judicial proceedings or the transcripts of such proceedings.” Ctr. for Nat’l Sec. Studies v. U.S. Dep’t of Justice, 331 F.3d 918, 935 (D.C. Cir. 2003).

.We wrote in In re Motions of Dow Jones & Co., 142 F.3d 496, 502 (D.C. Cir. 1998):
The Supreme Court ruled in Gannett Co. v. DePasquale, 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979), that the First Amendment did not entitle members of the media to attend a pretrial suppression hearing, at least so long as they could receive copies of the transcript at a later date after the danger of prejudice to the defendant had passed. The Court reached the opposite conclusion in Press-Enterprise Co. v. Superior Court (Press-Enterprise II), 478 U.S. 1, 12, 13, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986), holding that a "qualified First Amendment right of access attaches to preliminary hearings in California” — that is, probable cause hearings "sufficiently like a trial to justify” the conclusion that they should be open. One of the main differences between the two cases was that although the “near uniform practice of state and federal courts has been to conduct preliminary hearings in open court,” Press-Enterprise II, 478 U.S. at 10, 106 S.Ct. 2735; see also id. at 8, 106 S.Ct. 2735, the Court in Gannett could identify no long-standing tradition of public access to pretrial suppression hearings. 443 U.S. at 384-93, 99 S.Ct. 2898.

. See Richmond Newspapers, Inc. v. Virginia in which the Chief Justice explained that history was important because it showed that the "Bill of Rights was enacted against the backdrop of the long history of trials being presumptively open.” 448 U.S. at 575, 100 S.Ct. 2814 (Burger, C.J., plurality opinion). The Court gave the same explanation in Press-Enterprise I, 464 U.S. at 509 n.8, 104 S.Ct. 819. Justice Stevens, in his dissenting opinion in Press-Enterprise II, pointed out that "in our prior cases history mattered primarily for what it revealed about the intentions of the Framers and ratifiers of the First Amendment.” 478 U.S. at 22, 106 S.Ct. 2735.

. The district court here, Dhiab, 70 F.Supp.3d at 494, and in In re Guantanamo Bay Detainee Litigation, 624 F.Supp.2d 27, 35 (D.D.C. 2009), lamented the lack of any discussion in the caselaw of this subject.

. See United States v. McVeigh, 119 F.3d 806, 812 (10th Cir. 1997) ("Assuming that the Press-Enterprise II right of access extends to at least some types of judicial documents, the question remains whether that right applies to the particular types of documents at issue in this case.”); In re Grand Jury Subpoena, 103 F.3d 234, 242 (2d Cir. 1996) (holding that under Press-Enterprise II, the court must focus on the specific motion that the moving party seeks to disclose publicly, not the broader grand jury investigation or hearings in which the motion arose).

. See, e.g., McGehee v. Casey, 718 F.2d 1137, 1147 (D.C. Cir. 1983): "As a general rule, citizens have no first amendment right of access to traditionally nonpublic government information. See, e.g., Houchins v. KQED, Inc., 438 U.S. 1, 8-9, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978) (plurality opinion); id. at 16, 98 S.Ct. 2588 (Stewart, J., concurring); Saxbe v. Washington Post Co., 417 U.S. 843, 849, 94 S.Ct. 2811, 41 L.Ed.2d 514 (1974); Pell v. Procunier, 417 U.S. 817, 831-32, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974).”

. See generally Daniel L. Pines, The Continuing Viability of the 1875 Supreme Court Case of Totten v. United States, 53 Admin. L. Rev. 1273 (2001).

. See Fein, supra, at 828-31.

. This court has not decided the proper standard of review for a district court’s "compelling interest” analysis. The circuits disagree about whether to apply the ordinary "clear error” standard, Fed. R. Civ. P. 52(a)(6), or "de novo” review in light of Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 508-10, 508 n.27, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). See, e.g., United States v. Erie Cty., 763 F.3d 235, 238 (2d Cir. 2014); In re Hearst Newspapers, L.L.C., 641 F.3d 168, 174-75 (5th Cir. 2011). We need not decide this issue because we would reverse even if the standard were clear error.